VIVID, INC., a Wisconsin corporation, Petitioner-
Respondent,†

v.

Ronald R. FIEDLER, Secretary of the Wisconsin Depart-
ment of Transportation and Wisconsin Department of
Transportation, Respondents-Appellants-Petitioners.

Supreme Court

*No. 96–1900. Oral argument April 8, 1998.—Decided July 2,
1998.*

(Also reported in 580 N.W.2d 644.)

†Motion for reconsideration denied August 21, 1998.

For the respondents-appellants-petitioners the cause argued by *Robert W. Larson*, assistant attorney general, with whom on the briefs was *James E. Doyle*, attorney general.

For the petitioner-respondent there was a brief by *Thomas S. Hornig, Marc T. McCrory* and *Brennan, Steil, Basting & MacDougall, S.C.*, Janesville and oral argument by *Thomas S. Hornig*.

¶ 1. WILLIAM A. BABLITCH, J. This case involves the question of the proper determination of just compensation for outdoor advertising signs, owned by Vivid, Inc. (Vivid), that the State of Wisconsin removed in 1989 in conjunction with a highway improvement project along Interstate 90. Three issues are presented. 1) Does Wis. Stat. § 84.30 provide the exclusive remedy for just compensation for these signs? We conclude it does. 2) Does just compensation for the taking of these signs include the value of the location of the signs? We conclude it does. 3) What is the appropriate method for determining just compensation in this case? Three of us conclude that the use of a Gross Income Multiplier (GIM) method, among other valuation methods, was appropriate. Accordingly, although four justices concur in the result but disagree with the analysis regarding the GIM, we affirm the court of appeals' decision on these issues. However, the court of appeals also allowed attorney fees to Vivid. Because

§ 84.30 does not allow for attorney fees, we reverse the court of appeals on that issue.

## FACTUAL AND PROCEDURAL HISTORY

¶ 2. This case has a long and complex history which warrants review in some detail. Vivid is a company that owns outdoor advertising signs. Typically, Vivid rents land adjacent to heavily traveled roads and highways. Vivid then constructs a billboard on this rented land. Although Vivid rents the land on which the billboard is located (the sign site), Vivid owns the sign itself. Vivid contracts with businesses to display their advertising on the billboard for a certain term.

¶ 3. In 1988, the State Department of Transportation (DOT or State) notified Vivid that two signs, the "Antiques" sign and the "Trucks" sign, located next to Interstate 90 and the Avalon Road interchange near Janesville had to be removed as part of a highway improvement project. Vivid had eight- and nine-year sign site leases left on the property and 36-month advertising contracts on the signs.

¶ 4. The State offered compensation to the owners of the land on which the signs were located. The State also offered Vivid relocation benefits according to Wis. Stat. § 32.19 (1987–88)[1] and Wis. Admin. Code § ILHR 202.64. The relocation benefits offered included reasonable expenses relating to moving the signs as well as actual or reasonable expenses not exceeding $1,000 per sign for searching for new sign sites. The State informed Vivid that if the signs could not be moved, the State would reimburse Vivid for the actual, direct loss of its tangible personal property predicated

---

[1] All references to Wisconsin Statutes are to the 1987–88 version unless otherwise noted.

on the lesser of the units' depreciated in-place value or their estimated moving cost. Vivid did not respond to either the State's offer for Vivid to participate in the compensation offered to the landowners nor to the State's offer for relocation assistance. The State removed the signs in April, 1989.

¶ 5. On June 2, 1989, Vivid filed a notice of injury and notice of claim with the State, pursuant to Wis. Stat. §§ 893.80(1) and 893.82. Vivid claimed that it suffered a total of $54,000 in damages, an amount Vivid claimed reflected the fair market value of the razed signs. Vivid also requested interest and loss of revenues from April, 1989 when the signs were destroyed, as well as attorney fees. The State did not respond to these notices. On October 16, 1989, Vivid filed an action, requesting that inverse condemnation proceedings be commenced pursuant to Wis. Stat. § 32.10. With this action, Vivid requested just compensation under § 32.10 for the signs that the State removed and other costs and disbursements including attorney fees according to Wis. Stat. § 32.28.

¶ 6. The circuit court granted the State's motion for summary judgment and dismissed Vivid's petition for an inverse condemnation proceeding. Vivid appealed.

¶ 7. The court of appeals reversed the circuit court's order granting the State summary judgment and remanded the cause for further proceedings under Wis. Stat. § 32.10. *See Vivid, Inc. v. Fiedler*, 174 Wis. 2d 142, 147, 497 N.W.2d 153 (Ct. App. 1993) (hereinafter referred to as *Vivid I*).

¶ 8. This court granted the State's petition for review. The issue presented was whether Vivid was entitled to just compensation for its signs. The State argued that it need only pay Vivid relocation benefits

under Wis. Stat. § 32.19. Vivid argued that it was enti-
tled to just compensation under a variety of theories,
including Wis. Stat. § 84.30. Like the court of appeals,
this court concluded that the State had to pay Vivid
just compensation and remanded to determine the
amount of just compensation. *See Vivid, Inc. v. Fiedler*,
182 Wis. 2d 71, 73, 512 N.W.2d 771 (1994) (hereinafter
referred to as *Vivid II*). However, we relied solely on
§ 84.30 for our conclusion and specifically stated that
we need not reach the other grounds raised by Vivid to
support its argument that it was due just compensa-
tion. *See id.* at 75 n.4, 80.

¶ 9. We concluded that "[t]he fact that the bill-
boards were removed in the context of an eminent
domain proceeding, rather than under sec. 84.30(5),
which governs removal of nonconforming signs, is irrel-
evant. The express language of sec. 84.30(6) requires
payment of just compensation 'regardless of whether
the sign was removed because of this section.' " *Id.* at
79 (quoting Wis. Stat. § 84.30(6)). In remanding the
case to the circuit court for determination of the
amount of just compensation, this court directed the
circuit court to "refer to section 84.30(7), Stats., which
discusses the measure of just compensation and section
84.30(8), Stats., which discusses agreed price and adds
that compensation is determined under section 32.05,
Stats., if the DOT and the owner fail to reach agree-
ment on the amount of compensation." *Id.* at 81 n.8.

¶ 10. On remand, the Rock County Circuit Court,
John H. Lussow, Judge, allowed Vivid to proceed as if
the case were one for inverse condemnation under Wis.
Stat. § 32.10. Over the State's objection, the circuit
court allowed Vivid's expert to testify about valuing the
billboards using an income approach which considers
the income of the sign before the taking and projected

income after the taking, and a comparable sales or market approach which looks to comparable sales using a Gross Income Multiplier (GIM) to determine the amount of income produced by an individual sign. The circuit court also allowed the State's evidence regarding the cost approach which values the sign structure using cost-less-depreciation and then adds that to the leasehold value. The jury determined that the two billboards had a fair market value of $37,800, an amount far exceeding the amount calculated under the State's cost approach. Vivid then filed a motion for judgment on the verdict. The circuit court concluded that Vivid was entitled to judgment on the verdict of $37,800 as just compensation for the signs, interest on the judgment in the amount of $13,230 pursuant to Wis. Stat. § 32.05(11)(b), and litigation expenses including attorney fees of $166,261 pursuant to Wis. Stat. § 32.28, for a total judgment of $217,292 together with statutory interest.

¶ 11. The State appealed the circuit court's order. In an unpublished decision, *Vivid, Inc. v. Fiedler*, No. 96–1900, unpublished slip op. (Wis. Ct. App. Oct. 2, 1997) (hereinafter referred to as *Vivid III*), the court of appeals affirmed the circuit court's order. However, the court of appeals determined that the circuit court erred in allowing testimony regarding the GIM. *See id.*, unpublished slip op. at 13–14. They determined that the income approach was the appropriate valuation method in this case. *See id.*, unpublished slip op. at 15. The court of appeals determined that the error of admitting evidence regarding the GIM was harmless; therefore they concluded that they need not reverse and remand the judgment because the result would probably not be more favorable to the DOT under the income approach than the current jury ver-

dict—remand would not affect the substantial rights of the parties. *See id.*, unpublished slip op. at 19 (referring to Wis. Stat. § 805.18(2)).

¶ 12. This court granted the State's petition for review of this second court of appeals decision, *Vivid III*, on December 16, 1997.[2]

## JUST COMPENSATION AND BILLBOARD VALUATION

¶ 13. The first issue presented is whether Wis. Stat. § 84.30 provides the exclusive remedy for just compensation for the taking of Vivid's signs. Resolution of this issue requires interpretation of § 84.30. A question of statutory interpretation is a question of law which this court reviews de novo. *See Hughes v. Chrysler Motors Corp.*, 197 Wis. 2d 973, 978, 542 N.W.2d 148 (1996). Our primary goal in statutory interpretation is to discern the legislature's intent. *See*

---

[2] At the outset, Vivid argues that the State waived its right to appellate review and remand for a new trial because it failed to file motions after the jury verdict. " 'Motions after verdict must state with particularity the alleged error so as to apprise the trial court of the alleged error and give it an opportunity to correct it, thereby avoiding a costly and time-consuming appeal.' " *Calero v. Del Chemical Corp.*, 68 Wis. 2d 487, 497, 228 N.W.2d 737 (1975) (quoting *Kobelinski v. Milwaukee & Suburban Transport Corp.*, 56 Wis. 2d 504, 517, 202 N.W.2d 415 (1972)). Although failure to file post-verdict motions "limit[s] the issues that may be asserted as a matter of right on the appeal. . . .[T]he appeals court has jurisdiction over a timely appeal and may in its discretion conclude that, in the interest of justice, the issues not assertable as a matter of right may nevertheless be reviewed." *Hartford Ins. Co. v. Wales*, 138 Wis. 2d 508, 510–11, 406 N.W.2d 426 (1987). Accordingly, in the interest of justice, we review all issues raised by this case.

*id.* (citing *Scott v. First State Ins. Co.*, 155 Wis. 2d 608, 612, 456 N.W.2d 152 (1990)). This court ascertains that intent by first examining the plain language of the statute. *See Anderson v. City of Milwaukee*, 208 Wis. 2d 18, 25, 559 N.W.2d 563 (1997) (citations omitted). If the plain language is ambiguous, we then turn to the scope, history, context, subject matter and purpose of the statute to determine legislative intent. *See Hughes*, 197 Wis. 2d at 978 (citing *Scott*, 155 Wis. 2d at 612).

### A.

¶ 14. In *Vivid II*, this court determined that Vivid was entitled to just compensation under Wis. Stat. § 84.30(6). *See Vivid II*, 182 Wis. 2d at 81. "[W]e have concluded that just compensation is *statutorily* required by sec. 84.30(6). Our determination is based entirely on the statute and does not involve the just compensation provision contained in article I, section 13 of the Wisconsin Constitution." *Id.* at 80. In determining that Vivid was entitled to just compensation under § 84.30, we failed to make clear what we now explicitly conclude: § 84.30 is Vivid's exclusive remedy for recovering just compensation.

¶ 15. Wisconsin Stat. § 84.30 is the Wisconsin adaptation of the federal Highway Beautification Act (HBA), 23 U.S.C. § 131. The Wisconsin legislature adopted a state counterpart to the federal act to avoid a reduction in federal highway funding. "If Wisconsin does not act, it will lose about $6.7 million in federal aid highway funds." Robert W. Larsen, *Outdoor Sign Regulation in Eden and Wisconsin*, 1972 Wis. L. Rev. 153, Note at 164 (citing Milwaukee Journal, Feb. 28, 1971, at 22, col. 3, part 1).

¶ 16. Vivid argues that although Wis. Stat. § 84.30 provides that Vivid is due just compensation, it

may proceed under either § 84.30 or Wis. Stat. § 32.10 for determination of just compensation because the action is an eminent domain proceeding. We disagree. The language and framework of § 84.30 indicate that it is the exclusive remedy for determining just compensation for removed signs that meet the criteria of § 84.30(6).

¶ 17. As noted above, we discern the intent of the legislature by first turning to the plain language of the statute. *See Anderson*, 208 Wis. 2d at 25. The plain language of Wis. Stat. § 84.30 models 23 U.S.C. § 131 and sets forth the overall framework for recovering just compensation. Subsection (6) (reprinted below)[3] sets

---

[3] Wis. Stat. § 84.30(6) provides as follows:

(6) JUST COMPENSATION. The department shall pay just compensation upon the removal or relocation on or after March 18, 1972, of any of the following signs which are not then in conformity with this section, regardless of whether the sign was removed because of this section:

(a) Signs lawfully in existence on March 18, 1972.

(b) Signs lawfully in existence on land adjoining any highway made an interstate or primary highway after March 18, 1972.

(c) Signs lawfully erected on or after March 18, 1972.

Any sign that is visible from the main-traveled way of any interstate or federal-aid highway and maintained or erected in any area adjacent to and within 660 feet of an interstate or highway after March 18, 1972 or outside this area after June 11, 1976 is not in conformity with Wis. Stat. § 84.30 except the following:

(a) directional or other official signs; (b) signs advertising sale or lease of property upon which they are located; (c) signs advertising activities conducted on the property on which they are located; (d) signs located in business areas on March 18, 1972; (e) signs erected in business areas subsequent to March 18, 1972, which will comply with 84.30(4); (f) signs located in urban areas outside the adjacent area (footnote omitted); (g) landmark signs; (h) signs outside the adjacent area not erected for the purpose of being read from the main traveled way; (i) signs on farm buildings that promote a

forth the criteria for the types of signs for which just compensation is allowed. Subsection (7) (reprinted below)[4] provides the measure of just compensation if a sign meets the criteria of subsection (6). Subsection (8) (reprinted below)[5] sets forth the procedure for recovering just compensation. The signs in question in this case meet the criteria of § 84.30(6)—they were nonconforming signs lawfully in existence on March 18, 1972. Therefore, following the framework of § 84.30, just compensation must be measured under subsection (7)

Wisconsin agricultural product. (footnote omitted). Vivid's signs are nonconforming under sec. 84.30 because they do not fit within any of these categories.

*Vivid II*, 182 Wis. 2d at 78 (referring to Wis. Stat. § 84.30(3)).

[4] Wis. Stat. § 84.30(7) provides as follows:

(7) MEASURE. The just compensation required by sub. (6) shall be paid for the following:

(a) The taking from the owner of such sign, all right, title and interest in and to the sign and his leasehold relating thereto, including severance damages to the remaining signs which have a unity of use and ownership with the sign taken, shall be included in the amounts paid to the respective owner, excluding any damage to factories involved in manufacturing, erection, maintenance or servicing of any outdoor advertising signs or displays.

(b) The taking of the right to erect and maintain such signs thereon from the owner of the real property on which the sign is located.

[5] Wis. Stat. § 84.30(8) provides as follows:

(8) AGREED PRICE. Compensation required under subs. (6) and (7) shall be paid to the person entitled thereto. If the department and the owner reach agreement on the amount of compensation payable to such owner in respect to any removal or relocation, the department may pay such compensation to the owner and thereby require or terminate the owner's rights or interests by purchase. If the department and the owner do not reach agreement as to such amount of compensation, the department or owner may institute an action to have such compensation determined under s. 32.05.

and recovered following the procedure under subsection (8).

¶ 18. Vivid argues that although the signs may meet the criteria of Wis. Stat. § 84.30(6), this statute is not the exclusive remedy. Vivid essentially asks this court to ignore statutory language. At oral argument Vivid stated that the question in this case is whether the "little amendment that was grafted onto the end of § 84.30(6) makes an eminent domain case become magically a Highway Beautification Act removal case." What Vivid characterizes as a "little amendment" that the legislature "grafted" onto the end of a statute is critical to determining legislative intent. In 1978, 23 U.S.C. § 131(g) was amended to add that just compensation must be paid for removed signs "whether or not removed pursuant to or because of this section." The Wisconsin legislature followed suit and amended § 84.30(6) in 1979, adding the similar language: "regardless of whether the sign was removed because of this section." *See* Ch. 253, Laws of 1979.

██

¶ 19. By amending Wis. Stat. § 84.30(6) to add language that provides that the DOT shall pay just compensation "regardless whether the sign was removed because of this section," the legislature provided that just compensation is paid for this type of sign whether the sign is removed because of eminent domain, the HBA, a local ordinance, or any other reason. It does not matter why Vivid's signs were removed. Following the framework of § 84.30, if the signs meet the criteria of § 84.30(6), just compensation must be paid as measured under § 84.30(7) following the procedures of § 84.30(8).

¶ 20. Additionally, if Vivid were allowed to rely on Wis. Stat. § 84.30(6) only for the determination that

it is entitled to just compensation in the first place, but then turn to Wis. Stat. ch. 32 for determining the amount of just compensation, § 84.30 would become, in essence, a nullity. Every party whose signs meet the criteria of § 84.30(6) would nonetheless use chapter 32 for determining just compensation because that chapter allows for litigation expenses including attorney fees. *See* Wis. Stat. § 32.28. Section 84.30 does not provide for attorney fees and therefore, in all likelihood no one would rely on that statute.

¶ 21. Accordingly, following the language and framework of Wis. Stat. § 84.30, we conclude that § 84.30 is the exclusive remedy for determining just compensation for signs meeting the criteria of § 84.30(6).

## B.

¶ 22. Having determined that Wis. Stat. § 84.30 provides the exclusive remedy for compensation for removed signs meeting the statutory requirements, the question remains: what constitutes appropriate just compensation? Section 84.30(7) provides that "[t]he just compensation required by sub. (6) shall be paid for the following: (a) The taking from the owner of such sign, all right, title and interest in and to the sign and his leasehold relating thereto. . . ." § 84.30(7). Stated another way, the plain language of the statute requires that the sign owner be compensated for the value of all right in the sign, the value of the title, the value of the interest in and to the sign, and the value of the leasehold interest. The plain language of the statute does not, however, define what constitutes the value of the "right, title and interest in and to the sign," nor does it define what constitutes the value of the leasehold. We

therefore turn to extrinsic aids to determine the meaning of these terms and the interests compensable.

¶ 23. "Just compensation" is the fair market value of the property. "Fair market value, as in any other type of case, is ordinarily measured as the price that the aggregate asset—the lease, permit and sign—would bring in the marketplace in a voluntary sale to a knowledgeable buyer, considering all relevant factors." 8A *Nichols on Eminent Domain*, § 23.04[1] at 23–47 (footnote omitted) (3d ed. 1997).

¶ 24. The State argues that under Wis. Stat. § 84.30(6) and (7), the only compensable interests are the value of the sign structure and the value of the leasehold interest. The State asserts that the value of the leasehold interest encompasses the value of the sign site. Vivid, on the other hand, argues that the compensable value of an outdoor advertising sign is more than just the wood, nails, and paint that make up the sign structure. "[A] sign built of teak and ebony is no more valuable to a sign company than one built from pine." Respondent's brief at 42.

¶ 25. We agree with Vivid that the value of an outdoor advertising sign is more than just the sign structure and leasehold value of the land on which the sign sits. An important aspect of outdoor advertising is the value of the location. As Vivid argues, the materials of the sign do not influence its value. Rather, location is of paramount importance in outdoor advertising.

> [B]illboard locations, as compared to billboards themselves, are unique. Depending upon the viewable distance in either direction, the amount of traffic passing the location, and the type of viewing public, a location of a particular billboard may have a value over and above its nuts and bolts value. In

this sense, in the billboard industry, it is virtually impossible to separate location from the structure.

*City of Scottsdale v. Eller Outdoor Advertising Co.*, 579 P.2d 590, 598 (Ct. App. Ariz. 1978). A sign located near Janesville and next to Interstate 90, a main east-west interstate highway, is certainly more valuable than a sign located near Janesville but adjacent to County Highway A. In valuing outdoor advertising, the location has a value in and of itself. *See, e.g.,* Donald T. Sutte, MAI, *The Appraisal of Outdoor Advertising Signs*, Appraisal Institute (1994) ("[L]ocation is as important to a sign as it is to other types of real estate." (at 17); "Signs are purchased for their locations, the signboard structures themselves, and the land leases that run with the sites on which the signs stand." (at 18)).

¶ 26. In sum, just compensation consists of the fair market value of the property taken. In regard to outdoor advertising, we conclude that the value of the sign is derived largely from the location of the sign. Therefore, "all right, title and interest in and to the sign and. . .leasehold relating thereto" must include not only the value of the sign structure and leasehold value, but also the value of the location.

## C.

¶ 27. Having determined that the State must compensate Vivid not only for the sign structure and leasehold but also for the location of the sign, we now consider the valuation methods for determining such just compensation.

¶ 28. There is nothing in the plain language, legislative history, scope, context or purpose of Wis. Stat. § 84.30 or its federal counterpart, 23 U.S.C. § 131, that

restricts courts to a particular valuation method to determine just compensation. Ideally, as with any dispute, the parties can resolve their differences regarding just compensation without litigation. However, "[i]f the department and the owner do not reach agreement as to such amount of compensation, the department or owner may institute an action to have such compensation determined under s. 32.05." Wis. Stat. § 84.30(8).

¶ 29. In this case, the DOT and Vivid did not reach an agreement as to the amount of just compensation. Accordingly, either party could institute an action under Wis. Stat. § 32.05 for determination of just compensation. Under § 32.05, the parties must comply with several procedural steps. However, either party may ultimately appeal a determination of just compensation to the circuit court. *See* Wis. Stat. § 32.05(10)(a). The issue of just compensation must be tried by a jury unless jury trial is waived by both parties. *See id.* Generally, "any professionally accepted appraisal methodology. . .will be admissible in such cases with objections normally going to the weight, not the competency of the testimony." 8A *Nichols on Eminent Domain*, § 23.04 at 23–52 (footnote omitted). *See also Eller Outdoor Adver. Co.*, 579 P.2d at 598. "The court shall enter judgment for the amount found to be due. . . ." Wis. Stat. § 32.05(10)(b).

¶ 30. Like Wis. Stat. § 84.30, Wis. Stat. § 32.05 does not dictate a particular valuation method to determine just compensation. Rather, § 32.05 requires that the issue of just compensation be determined by a jury. We discern no authority in the statutes for the State's assertion that just compensation must be determined using the cost approach.

¶ 31. There are three recognized valuation methods for billboards: cost approach, income approach and market approach. *See* 8A *Nichols on Eminent Domain*, § 23.04[4] at 23–51 through 23–59. In the present case, the State presented evidence regarding the cost approach. Vivid presented evidence regarding both the income and market approaches. Admission of evidence is left to the discretion of the circuit court. *See Leathem Smith Lodge, Inc. v. State*, 94 Wis. 2d 406, 409, 288 N.W.2d 808 (1980). Three of us conclude that the circuit court did not erroneously exercise its discretion in admitting evidence from both the State and Vivid regarding different valuation methods for the jury to determine which method is more credible and more adequately reflects just compensation.[6]

¶ 32. Under the cost approach to valuing billboards, advocated by the State, the sign structure and the leasehold interest in the sign site are first valued separately. The sign structure is valued by using cost-less-depreciation which simply considers the cost of reproducing the sign as new (the wood, bolts, etc.) minus depreciation. *See, e.g., Soo Line R. Co. v. Dept of Revenue*, 89 Wis. 2d 331, 350, 278 N.W.2d 487 (Ct. App. 1979) (regarding property tax assessment of railroad). The value of the leasehold interest is the difference

---

[6] The concurring opinion, which really should have been written as the majority opinion, reaches out and resolves an issue not before us: the appropriateness of the cost approach. This issue was neither raised, briefed nor argued by Vivid. Because Vivid did not challenge the admissibility of the State's cost approach, the three of us would not determine whether the cost approach adequately compensates Vivid for the value of the location of the signs; neither should the concurrence.

between the contractual rent that the sign company is paying to the land owner and the market rent at the time of the appraisal. *See* 23 CFR § 750.303(c) (1989). The value of the sign structure and the leasehold interest are then combined as the measure of just compensation. The State put no value on the leasehold interest in this case because there was no difference between Vivid's contractual rent and the market rent. Thus, the State in effect valued only the sign structure.[7]

¶ 33. Vivid offered testimony regarding both the market and income approaches. The market approach uses the GIM to value the billboards by looking to the sale of reasonably comparable property. *See, e.g., Rosen v. Milwaukee*, 72 Wis. 2d 653, 662, 242 N.W.2d 681 (1976) (regarding property tax assessment) (quoting *State ex rel. Enterprise Realty Co. v. Swiderski*, 269 Wis. 642, 645, 70 N.W.2d 34 (1958)). A GIM is a unit of comparison. It is determined by dividing the sales price of a group of signs by the annual gross rental income generated by those signs. For an example of how the GIM generally works, see below.[8] *See* 8A *Nichols on*

---

[7] Using the cost-less-depreciation method, the State's appraiser valued the "Antiques" sign at $5,000 and the "Trucks" sign at $5,500. He arrived at these figures by calculating the cost of reproducing the signs as new (the wood, bolts, etc.) minus 35% depreciation, plus an estimated value of the artwork at $1,000 minus 30% depreciation, plus $2,500 to compensate Vivid for its time and effort in looking for a new site for the sign.

[8] Example: Ten billboards generating $100,000 gross annual rental income are sold for $400,000. The Gross Rent [Income] Multiplier, sales price divided by gross rental income, is four ($400,000 [/] $100,000 = 4). If the billboard being appraised generates $12,000 gross rental income per year, its value is $48,000, four times income (4 x $12,000 = $48,000).

*Eminent Domain*, § 23.04[4][c] at 23–57–58. For an analysis of how the GIM worked in this case, see below.[9]

---

8A *Nichols on Eminent Domain*, § 23.04[4] at 23–58.

[9] Vivid's appraiser looked at a number of recent sales of signs and sign businesses and narrowed the comparable properties to four that, in his professional judgment, were the most comparable. Within that group of four comparable sales, the appraiser used a "bracketing" method. That is, he identified one of the four comparable sales as involving property that was better than the signs being appraised. The GIM for that property set the high limit. He also identified a comparable sale of property that was not as good as the signs being appraised and the GIM from that sale set the low limit. Then, using his professional judgment, the appraiser determined that an appropriate GIM to use for the signs being appraised was between the high and low limits.

Specifically, the high limit GIM in this case was the sale of a group of well-maintained smaller signs near Rockford, Illinois which were well located. Dividing the sales price of this group of signs of $125,000 by the annual gross rental income of $29,268, the GIM was 4.27. The low limit GIM in this case was the sale of a group of older signs, some of which were on Interstate 43. Dividing the sales price of $225,000 by the annual gross rental income of $80,820, the GIM for this sale was 2.78. A third comparable sale was the sale of an entire sign company in Madison, Wisconsin. Dividing the sales price of $4,900,000 by the annual gross rental income of $1,338,890, the GIM for this sale was 3.38. Because this sale of the entire sign business included some personal property assets, the appraiser testified that he would adjust down by 5 percent so the GIM would be 3.2. Finally, the appraiser considered the sale of 71 signs, none of which were on interstate highways as were the signs being appraised. Dividing the sales price of $550,000 by the annual gross rental income of $194,412, the GIM for this sale was 2.83. Thus, the low limit GIM was 2.78 and the high limit GIM was 4.27. Given the GIMs calculated from these comparable sales

¶ 34. Vivid argues that the GIM used in the market approach is a valid valuation method because it actually measures the fair market value—what a willing buyer would pay to a willing seller. Three of us

---

and his experience in the industry, the appraiser used his professional judgment to determine that an appropriate GIM in this case would be 3.5. He testified that an average GIM for signs in a rural area would usually be 3 to 3.2. However, because these signs, located on the interstate, bring a higher rent for the least amount of labor, the appraiser determined a GIM of 3.5 was more appropriate.

The appraiser then applied the GIM of 3.5 to the signs being appraised by multiplying the gross rental income of the sign by the GIM. Accordingly, he appraised the value of the "Antiques" sign as $21,000, calculated by multiplying the annual gross rental income of $6,000 by the GIM of 3.5.

Regarding the "Trucks" sign, the appraiser testified that when he did the appraisal, he erroneously used an annual gross rental income for the sign of $9,480 which was $790 per month for 12 months. He testified that this was in error, however, because the contract for the "Trucks" sign was for two sign faces and only one sign face was removed by the DOT. Accordingly, at the trial he testified that the gross monthly rental income attributable to the "Trucks" sign should be $550. He arrived at that figure by looking to the rent for the "Antiques" sign which was directly across the interstate but facing the other direction. He testified that the signs were in similar condition and size. He testified that he attributed an extra $50 per month in rental income to the "Trucks" sign because it was illuminated which usually generates higher revenue. Using this monthly gross rental income of $550 or an annual gross rental income of $6,600, the appraiser testified that the value of the "Trucks" sign was $23,100, calculated by multiplying the annual gross rental income of $6,600 by the GIM of 3.5.

The total amount of just compensation for the two signs, using Vivid's appraiser's market/GIM approach was $43,100. The jury awarded Vivid $37,800.

agree. Vivid is entitled to just compensation, *see Vivid II*, 182 Wis. 2d at 73, and just compensation is the fair market value of the property taken, in this case, two billboards. Fair market value is what a willing buyer would pay to a willing seller, neither being under compulsion. *See* 8A *Nichols on Eminent Domain*, § 23.04[1] at 23–47. Here there is ample evidence, not contradicted by the State, that the outdoor advertising industry uses the GIM to determine the value of signs in a transaction between a willing buyer and a willing seller.

■■■■

¶ 35. Because "in the market for the purchase and sale of billboards, buyers and sellers negotiate price as a function of the income the signs produce,. . . ." *id.* at 23–58, appraisers developed the gross income multiplier as the best means to determine the price a willing buyer would pay to a willing seller. *See id.*

> The Gross. . .[Income] Multiplier approach appears particularly appropriate where the evidence establishes that the sign involved in the condemnation cannot be relocated onto the remaining property or elsewhere in the immediate area. This approach best measures the value of the location inherent in the value of the aggregate asset of the lease, permit and billboard because it is predicated on income produced by the sign at the location, avoiding the shortcoming of the cost approach which ignores the location altogether.

*Id.* at 23–59 (footnotes omitted). A factor which weighs heavily in a court's decision to admit evidence of the market approach and GIM is the assertion that the billboard cannot be relocated. *See, e.g., Eller Outdoor Adver. Co.*, 579 P.2d 590.

¶ 36. As we discussed above, location is an extremely important part of valuing a billboard. The market approach using the GIM takes the value of the location into consideration. It reflects the fair market value—what a willing buyer would pay a willing seller—the measure used by the outdoor advertising industry itself in actual practice. Accordingly, three of us conclude that the market approach using the GIM is an appropriate valuation method for the jury's consideration. Certainly, given the nature of the billboard industry, a willing seller would set a price to reflect the value of the location. Three of us believe that questions regarding the appropriateness of what the appraiser uses as comparable sales to determine the GIM, and other questions such as the length of the leasehold interest, are factors for the jury to consider.

¶ 37. The State argues that the GIM approach is an invalid valuation method as a matter of law because non-compensable business profits (explained below)[10] are inextricably intertwined with the valuation. The State relies in part on a 1993 memorandum from the Federal Highway Administration (FHWA) to regional

[10] Business profits are the profits attributable to the labor and skill of the business owner. *See Leathem Smith Lodge, Inc. v. State*, 94 Wis. 2d 406, 412, 416, 288 N.W.2d 808 (1980). Lost business profits are not compensable because they reflect the value attributable to the work, efforts, and skill of the property owner rather than the value attributable to the property. *See United State v. Petty Motor Co.*, 327 U.S. 372, 377–78 (1946) ("Since 'market value' does not fluctuate with the needs of the condemnor or condemnee but with general demand for the property, evidence of loss of profits, damage to good will, the expense of relocation and other such consequential losses are refused in federal condemnation proceedings.") (citations omitted). In other words, business profits are contrasted with the profits attributable to the value of the property.

FHWA administrators regarding guidance on valuation of billboards. The FHWA stated that total reliance on the GIM or income approaches is not appropriate because it is difficult to separate out lost business profits which are not compensable. The FHWA did provide, however, that the GIM and income approaches could be used if components attributable to lost business profits were documented and excluded from the valuation. Three of us first note that the guidance from the FHWA is a memorandum, not regulations. More importantly, three of us fail to discern what "business profits" are associated with an outdoor advertising sign once the sign is in place. Although the FHWA stated that the GIM is inappropriate because it is virtually impossible to separate the income attributable to the business, the FHWA failed to explain what constitutes income attributable to the business.

¶ 38. The State also failed to indicate what constitutes lost business profits. In contrast to a resort which requires day-to-day labor by the owners and employees, *see, e.g., Leathem Smith*, 94 Wis. 2d at 416, little if any labor is required to maintain a billboard, except for occasionally changing a light bulb. With respect to outdoor advertising, three of us discern little if any profits attributable to the labor and skill of Vivid. Profits are largely attributable to the location of the sign. 

¶ 39. Regardless of which approach the jury ultimately concludes reflects the proper determination of just compensation, the circuit court must instruct the jury to exclude any evidence of lost business profits or expected lease or contract renewals. *See Dusevich v. Wis. Power & Light Co.*, 260 Wis. 641, 642, 51 N.W.2d 732 (1952) (regarding lost business profits); *Reibs v.*

*Milwaukee County Park Commission*, 252 Wis. 144, 148–49, 31 N.W.2d 190 (1948) (regarding expectation of lease renewal).[11] In the present case, the circuit court correctly instructed the jury that it could not consider lost business profits. Using the GIM method, Vivid's appraiser testified that the fair market value for the two signs was $43,100. The jury returned a special verdict, awarding Vivid $37,800 as just compensation for both signs. Although three of us believe that it is difficult to discern lost business profits in outdoor advertising valuation and the State has pointed to no particular lost business profits, the jury may have, in some measure, taken non-compensable lost business profits into consideration in awarding an amount lower than that resulting from the GIM calculation.

¶ 40. Three of us conclude that the market approach to valuing outdoor advertising, using the GIM is an appropriate valuation method. As the standard used in the industry for valuing signs, the GIM reflects fair market value. While we agree that lost business profits are not compensable in determining

---

[11] The concurring opinion concludes that the GIM could improperly compensate for expectation of lease renewal. *See* concurring op. at 802. However, the concurring opinion determines that using the GIM in this case did not compensate for expectation of lease renewal because "[t]he GIM of 3.5 establishes the valuation for the billboard at the equivalent of 3.5 years of earnings, but the ground leases on the signs in question had a term of at least eight more years." Concurring op. at 802. The concurring opinion fails to recognize, however, that the remaining length of the lease is a consideration in choosing the proper comparable properties from which the GIM is determined. *See* Donald T. Sutte, MAI, *The Appraisal of Outdoor Advertising Signs*, Appraisal Institute (1994), at 45–46.

just compensation, three of us discern no lost business profits associated with outdoor advertising. The value of billboards, once constructed and in place, is largely a function of the location, not the labor and skill of the sign company. Three of us cannot say that the circuit court erroneously exercised its discretion in admitting evidence of the market approach using the GIM.[12]

¶ 41.　The State also challenges Vivid's introduction of evidence regarding the income approach which values property on "the basis of the income prior to

---

[12] The solution proposed by the three of us would bring an end to the problems guaranteed to result from the concurring opinion. The concurring opinion creates more problems than it solves. It will create confusion in the circuit courts as to how and when to apply the GIM. Circuit courts will not know what to do with the court of appeals' decision in this case regarding the valuation analysis. Accordingly, it will inevitably lead to future litigation. We have had *Vivid I*, *Vivid II*, *Vivid III*, and today *Vivid IV*. *Vivid V* will now surely follow.

The concurring opinion tells circuit courts that the GIM is sometimes acceptable, sometimes not, but provides little guidance as to when to allow it. This case may provide a good example of the concurring opinion's failing. Here, the State argues that the GIM is invalid because it may compensate for lost business profits. The State fails, however, to provide any evidence to support its argument. The State failed to introduce any evidence to show what portion of the revenue generated by the billboards in question is attributable to the efforts of the business rather than the location. Similarly, the FHWA, in its memorandum, offered no explanation regarding what constitutes lost business profits. While the three of us agree that business profits are not compensable, we are not persuaded that lost business profits are compensated under the GIM, especially when neither the State in support of its argument, the FHWA in support of its memorandum, nor the concurrence in this case, can provide any enlightening guidance to the contrary.

taking and projected income after the taking." *Leathem Smith*, 94 Wis. 2d at 411. Vivid introduced this evidence, not as a valuation method for these signs, but as a check on the valuations determined using the market approach. The income approach resulted in a valuation of the billboards of $39,300.

¶ 42. As a general rule, income evidence is not admissible where there is evidence of comparable sales. *See id.* at 413. There are, however, three exceptions: 1) profit is produced without the owner's labor; 2) profits derived from the property's use are the chief source of its value; and 3) the property is so unique that comparable sales data is not available. *See id.* at 414. We agree with the court of appeals that valuation of billboards falls within the second exception: profits derived from the use of the billboard is the chief source of its value. (Of course, as discussed above, in the billboard industry profits are determined largely by location.)

¶ 43. Valuation of billboards may also fall within the third exception to introducing income evidence: the billboard is so unique that comparable sales data is not available. However, as mentioned above, the question regarding the appropriateness of what the appraiser uses as comparable sales is a question for the jury.

¶ 44. The income approach has been criticized as "a veiled attempt to recover non-compensable business damages. Nevertheless, nearly every court that has been confronted with this argument has held to the contrary and allowed the jury, in assessing just compensation, to consider the income generated by the rental of the sign faces to the advertisers." 8A *Nichols on Eminent Domain,* § 23.04[4] at 23–56 (citing *State v.*

*Waller*, 395 So. 2d 37, 41–42 (Ala. 1981); *Arkansas State Highway Comm'n v. Cash*, 590 S.W.2d 676, 678 (Ark. Ct. App. 1979); *Eller Outdoor Adver. Co.*, 579 P.2d at 597–98; *City of Norton Shores v. Hiteco Metrocom*, 517 N.W.2d 872 (Mich. Ct. App. 1994); *State v. Weber-Connelly, Naegele, Inc.*, 448 N.W.2d 380, 384 (Minn. Ct. App. 1989); *National Adver. Co. v. State Dept. of Transp.*, 611 So. 2d 566, 570 (Fla. Dist. Ct. App. 1992)).

¶ 45. In sum, three of us conclude that the circuit court properly allowed the parties to introduce evidence regarding different valuation methods for the jury to weigh in determining the appropriate just compensation for the signs. The circuit court also correctly instructed the jury not to consider lost business profits.

¶ 46. Finally, the State argues that the circuit court erred in excluding Vivid's own testimony before the City of Reedsburg Board of Review. The State wanted to cross-examine Vivid's operations manager regarding testimony made by Vivid representatives at proceedings before the Board of Review using the cost-less-depreciation approach to value sign structures in Reedsburg for tax purposes. The State also wanted to admit Vivid's Statement of Personal Property which showed Vivid's self-assessments of the values of signs using the cost-less-depreciation valuation method for property tax purposes. The State wanted to use these statements to impeach the witness and for the truth of the matter asserted. The circuit court excluded this evidence as irrelevant, and the court of appeals affirmed.

¶ 47. Questions of admissibility of evidence are questions within the circuit court's discretion. *See*

*Grube v. Daun*, 213 Wis. 2d 533, 541–42, 570 N.W.2d 851 (1997) (citing *State v. Pharr*, 115 Wis. 2d 334, 342, 340 N.W.2d 498 (1983)). "Where this court is asked to review such rulings, we look not to see if we agree with the circuit court's determination, but rather whether 'the trial court exercised its discretion in accordance with accepted legal standards and in accordance with the fact of record.' " *Grube*, 213 Wis. 2d at 542 (citing *State v. Pharr*, 115 Wis. 2d 334, 342, 340 N.W.2d 498 (1983)).

■■■

¶ 48. We need not determine whether the evidence of Vivid's testimony before the City of Reedsburg Board of Review or its self-assessments for its Statement of Personal Property was relevant. Because the State had already introduced undisputed testimony regarding the value of the sign structure, using the cost approach, evidence of Vivid's tax assessments was cumulative. *See* Wis. Stat. § 904.03. We cannot say that the circuit court erroneously exercised its discretion when it excluded this evidence. Accordingly, we affirm the court of appeals on this issue.

ATTORNEY FEES

¶ 49. We must finally determine whether Vivid is allowed litigation expenses including attorney fees for this action. Vivid argues that using Wis. Stat. § 32.05 to determine the amount of just compensation converts the action into one under Wis. Stat. ch. 32. We disagree. Wisconsin Stat. § 84.30(8) only authorizes parties and the court to use § 32.05 to determine the amount of just compensation when the parties cannot agree on a just compensation. Using § 32.05 to determine the amount of just compensation does not make the action one under chapter 32. The action is still governed by

§ 84.30. Accordingly, Wis. Stat. § 32.28, allowing litigation expenses including attorney fees for actions under chapter 32, is not applicable.

¶ 50. Because we determine that Wis. Stat. § 84.30 provides the exclusive remedy when the State removes signs that meet the requirements of § 84.30, we must determine whether attorney fees are allowed under § 84.30. No provision of § 84.30 authorizes an award of attorney fees either at the circuit court or on appeal. *Cf. Gottsacker Real Estate Co. Inc. v. State*, 121 Wis. 2d 264, 270, 359 N.W.2d 164 (Ct. App. 1984) (litigation expenses under Wis. Stat. § 32.28 are recoverable for costs incurred both at the circuit court and on appeal). Accordingly, Vivid may not be awarded attorney fees. The part of the court of appeals' decision affirming the circuit court's judgment in Vivid's favor for litigation expenses pursuant to § 32.28 is reversed. Therefore, we need not address the State's argument that attorney fees and costs are barred by the doctrine of sovereign immunity.

## CONCLUSION

¶ 51. In sum, we hold that Wis. Stat. § 84.30 provides the exclusive remedy for determining just compensation when the State takes or removes outdoor advertising signs that meet the statutory requirements of § 84.30, regardless of why the signs were removed. In this case, Vivid meets the requirements of § 84.30; therefore, this statute provides Vivid's exclusive remedy for determination of just compensation for the signs removed by the State.

¶ 52. We also conclude that all right, title, and interest in and to the sign and the leasehold interest includes not only the value of the sign structure itself

and leasehold value, but also the value of the sign location. Therefore, three of us conclude that the parties may introduce evidence, as they did in this case, regarding different valuation methods for the jury to weigh in determining the appropriate just compensation for the signs.

¶ 53. Accordingly, we affirm that part of the court of appeals' decision which upheld the jury verdict as to the value of the signs. However, three of us modify the reasoning of the court of appeals. Three of us disagree with the court of appeals that the circuit court erred in admitting evidence of the GIM valuation method. Although Wis. Stat. § 84.30 is the exclusive remedy, when the parties cannot agree on the amount of just compensation, determination of the just compensation is made by a jury after hearing evidence on various valuation methods, including the GIM.

¶ 54. Finally, we determine that just compensation under Wis. Stat. § 32.05 does not convert the action to one under Wis. Stat. ch. 32. The action remains under Wis. Stat. § 84.30. Because § 84.30 does not allow for litigation expenses, such expenses including attorney fees are not available. Accordingly, we reverse that part of the court of appeals' decision which affirmed the circuit court's entry of judgment for litigation expenses pursuant to Wis. Stat. § 32.28. We remand the cause to the circuit court for entry of judgment eliminating the portion of the judgment which awarded Vivid litigation expenses.

*By the Court.*—The decision of the court of appeals is affirmed in part, reversed in part, and remanded with directions.

¶ 55. ANN WALSH BRADLEY, J. (*concurring*). I agree with the lead opinion's determination that the legislature intended Wis. Stat. § 84.30 to provide the exclusive statutory means by which an advertising company may obtain just compensation for a billboard ordered removed. I also agree with the lead opinion's determination that Wis. Stat. § 84.30 does not authorize an award of attorney's fees. Nevertheless, I write separately because I do not subscribe to the lead opinion's carte blanche approval of the gross income multiplier (GIM) as a method of determining just compensation or to the lead opinion's interpretation of the cost approach method of valuation.[1]

¶ 56. Just compensation is to compensate only for the value of the property, not for the value of the business. Yet, in many cases the application of the GIM will result in compensation for loss of business profits and for the value of expectation of lease renewal. Compensation for such items is specifically prohibited by our prior cases.

¶ 57. At trial, Vivid offered the testimony of both an expert appraiser and Vivid's Chairman as to the proper valuation of the signs ordered removed by the Department of Transportation (DOT). Both individuals offered valuations of the billboards based on a valuation technique often used in sales between market participants, the GIM. *See* 8A *Nichols on Eminent*

---

[1] A concurrence which receives the support of a majority of participating justices on a particular issue becomes the opinion of the court on that issue. *See State v. Dowe*, 120 Wis. 2d 192, 194, 352 N.W.2d 660 (1984); *see also State v. Elam*, 195 Wis. 2d 683, 685, 538 N.W.2d 249 (1995); *State v. Outlaw*, 108 Wis. 2d 112, 321 N.W.2d 145 (1982); *Greiten v. LaDow*, 70 Wis. 2d 589, 235 N.W.2d 677 (1975); *State v. King*, 205 Wis. 2d 81, 88, 555 N.W.2d 189 (Ct. App. 1996).

*Domain*, Sec. 23.04[4] at 23–52 (1997). One offered a valuation of $50,400 based on a multiple of four, and the other offered a valuation of $44,100 based on a multiple of 3.5. Valuations with the GIM are obtained by dividing the sales price of a "comparable" property or enterprise by the annual gross earnings of the property sold. The resulting ratio is then multiplied against the annual earnings of the property that is being appraised. *See id.* at 23–58. Accordingly, the GIM is an earnings-dependent valuation technique.[2]

¶ 58. The DOT strongly objected to Vivid's proffer of the GIM based valuations. The DOT's objections to the GIM valuation were not novel, since states and advertising companies have been fighting over the merits of GIM valuations for years, with sporadic victories going to each side. *Compare National Adver. Co. v. State Dept. of Transp.*, 611 So. 2d 566, 570 (Fla. Ct. App. 1992) *with State ex. rel. Missouri Hwy. & Transp. Comm'n v. Quiko*, 923 S.W.2d 489 (Mo. Ct. App. 1996); *Whiteco Indus. v. City of Tucson*, 812 P.2d 1075, 1078 (Ariz. Ct. App. 1991). This court has never opined as to whether the GIM is an acceptable method of valuation of billboards in "just compensation" cases, despite the general use of the GIM in market transactions.

¶ 59. The controversy surrounding the use of the GIM in this case exists in large part because the very foundation of the GIM is based on the sale of a business. The initial calculation of the GIM is derived not from the sale of one billboard, an unlikely prospect as the lead opinion concedes, but rather from the sale of an entire advertising concern. In such cases, it can be "virtually impossible to determine the amount of

---

[2] If we assume that earnings are constant, a GIM of 3.5 can be viewed as valuing a piece of property as equal to 3.5 times annual earnings.

income that should be attributed to the billboard and which portion should be attributed to the marketing and other aspects of the business." Federal Highway Administration, U.S. Department of Transportation, Memorandum and Attachment, *Guidance on the Valuation of Billboards*, Oct. 20, 1993.[3]

¶ 60. The DOT and the court of appeals cite two significant legal justifications for their claim that use of the GIM in valuing Vivid's signs was improper. First, the DOT argues that use of the GIM automatically gives Vivid compensation for the loss of "business profits." Such a result is problematic because in Wisconsin, like other states, "just compensation" does not include compensation for the loss of "business profits." *See Dusevich v. Wisconsin Power & Light Co.*, 260 Wis. 641, 51 N.W.2d 732 (1952). "Business profits" is defined as those earnings attributable to the efforts and skill of the property owner in running the business, such as a program to increase sales, and not to the existence of the property itself. *See Leathem Smith Lodge, Inc. v. State*, 94 Wis. 2d 406, 412, 416, 288 N.W.2d 808 (1980).

¶ 61. The court of appeals, however, rested its reversal of the circuit court not on a "business profits" problem, but rather on that court's belief that the GIM had an "Achilles Heel:" the GIM compensates for the value of an expectation that a leasehold will be

---

[3] If GIMs in cases of this nature were derived through the use of comparable sales of individual signs with existing leases, I may give some credence to the lead opinion's reliance on the proposition that "the remaining length of the lease is a consideration in choosing the proper comparable. . . ." However, as the facts here demonstrate, that is not the case. Earnings multiples are at best an inexact method of valuation. Where it is apparent from the face of the evidence that the GIM compensates for something barred as a matter of law, the GIM must be rejected.

renewed. Like business profits, the value of such expectations is not compensable. *See Riebs v. Milwaukee County Park Comm'n*, 252 Wis. 144, 148–49, 31 N.W.2d 190 (1948). Testimony in this case indicated that Vivid was "95% certain" that its leases on the two signs would be renewed.

¶ 62. Vivid acknowledged in its brief that the "just compensation" concern of the court of appeals that the GIM may value the possibility of renewing a lease was "generally correct," but argued that such a concern did not exist in this case. *See* Respondent's brief at 25. Moreover, Vivid did not directly contradict the DOT's assertions that use of the GIM included compensation for Vivid's lost business profits. Vivid's only real response was that the record showed that "its business losses were significantly higher than what Vivid was seeking for just compensation." *See id.* at 29. Vivid apparently argues that because all of its business losses are not being compensated, the court should ignore the fact that some of its business profits are possibly being compensated—an untenable proposition.

¶ 63. The lead opinion responds to the concerns raised by the DOT and the court of appeals both substantively and procedurally. The lead opinion substantively dismisses the DOT's concerns over compensation for lost business profits by indicating that it "fail[s] to discern what 'business profits' are associated with an outdoor advertising sign once the sign is in place" and that "little if any labor is required to maintain a billboard, except for occasionally changing a light bulb." Lead op. at 790. Thus, in the lead opinion's view, the value of the GIM in this case is "largely attributable to the location of the sign," and there is no compensation for lost business profits.

¶ 64. The facts of this case, however, illustrate my concern that the use of the GIM in some cases may have the potential to compensate for lost business profits. The Chairman of Vivid testified that Vivid is not merely a corporate entity which owns the physical structure of the billboards. Rather, Vivid is a comprehensive advertising enterprise which actively markets the availability of its billboards, employs an artist to create the advertising copy for its clients, and creates the actual advertisement materials placed on the billboard. The Chairman also testified that in some cases Vivid changes the artwork on its billboards on a monthly basis for the same client. Thus, Vivid's involvement with its sign business also involves the skill and management of an ongoing concern.

¶ 65. Next I consider the court of appeals' focus on the "Achilles' Heel" of the GIM, the potential compensation for lease renewal. Vivid concedes that the use of the GIM in billboard cases generally requires close scrutiny since the valuation may include compensation for the value of an expected lease renewal. Despite the court of appeals' concern in this case with such a problem, it appears from the facts of this case that no such problem exists here. The GIM of 3.5 establishes the valuation for the billboard at the equivalent of 3.5 years of earnings, but the ground leases on the signs in question had a term of at least eight more years. Thus, while the court of appeals was correct in theory in highlighting inherent problems with the GIM, the compensation problem it raised does not affect the outcome of this case because the earnings used in the valuation are not attributable beyond the terms of the present leases.

¶ 66. Both of the concerns highlighted above demonstrate the potentially problematic nature of the

GIM. Although the GIM is generally used in the marketplace for valuation purposes, inherent in this earnings-dependent method of valuation are the same general concerns acknowledged by both of the parties as well as the court of appeals—compensating for loss which cannot by law be included in just compensation.[4]

¶ 67. Instead of addressing the potential for compensation beyond "just compensation" when using the GIM directly, the lead opinion determines that it is for the jury, not the court, to evaluate the acceptability of the GIM valuation. Apparently acknowledging that there will be cases in which the GIM includes compensation for "business profits" and leasehold renewal expectancies, the lead opinion determines that all the circuit court need do is instruct the jury to avoid compensating Vivid for those uncompensable items. This procedural resolution of the dilemma presented by GIM valuations misconstrues the proper role of the court and the trier of fact.

¶ 68. The circuit court acts as the evidentiary gatekeeper at trial. This court accordingly has recognized that circuit courts retain significant discretion in the admission of evidence at trial. *See Grube v. Daun,* 213 Wis. 2d 533, 541–42, 570 N.W.2d 851 (1997). However, as this court has also repeatedly noted, a circuit court erroneously exercises that discretion when it

[4] This concurrence and the lead opinion adopt divergent solutions to this quandary. I require the circuit court to consider the evidence on its face and uphold the law barring compensation for loss of business profits and the expectancy of renewing a lease, even in the face of technical valuation methods. The lead opinion, on the other hand, allows the circuit court to abdicate its responsibility to prevent unlawful compensation, enhancing the prospect of additional appellate review. Given a choice between the two positions, I chose the former.

applies the wrong legal standard to the facts at hand. *See id.* at 542.

¶ 69. As noted above, compensation for lost business profits and the expectancy of leasehold renewal is improper as a matter of law. *See Dusevich*, 260 Wis. at 642; *Riebs*, 252 Wis. at 148–49. If a circuit court can determine from the facts that a GIM valuation in a particular case includes components which are not otherwise compensable as part of "just compensation," then it is for the court, not the trier of fact, to bar the evidence. To reach any other conclusion would allow circuit courts to abdicate responsibility for precluding the jury from being swayed by inadmissible evidence.

¶ 70. Next, I address the lead opinion's misinterpretation of the cost approach.[5] To further buttress its adoption of the GIM, the lead opinion indicates that the cost approach does not include any component of valuation for the location of the sign. The lead opinion states, "[h]aving determined that the State must compensate Vivid not only for the sign structure and leasehold but also for the location of the sign." The lead opinion additionally notes: "[w]e also conclude that all right, title, and interest in and to the sign and the leasehold interest includes not only the value of the sign structure itself and leasehold value, but also the value of the sign location." Lead op. at 782, 796–97.

¶ 71. However, under the cost approach the value of location is already considered in the value of the leasehold. The leasehold value is defined as the difference between the contractual rent that the sign

---

[5] Despite the lead opinion's interpretation of events to the contrary, I address this issue solely to respond to what I consider to be an attack on the cost approach used by the lead opinion to buttress its GIM analysis. But for the lead opinion's use of this tactic, I need not write on this issue.

company is paying to the landowner and the market rent at the time of the appraisal. *See* 23 CFR § 750.303(c) (1989).

¶ 72. The amount of rent is affected by location. The better the location, the higher the rent. Thus, the lead opinion is incorrect when it suggests that location must always be considered in the cost approach in addition to the value of the sign and the leasehold value. The value of the location is not in addition to the value of the leasehold but rather it is already included in the value of the leasehold because the value of the leasehold is determined by a comparison of rents.

¶ 73. While the lead opinion's implicit dissatisfaction with the cost approach may be appropriate in this case, as a general proposition, the cost approach is also an accepted method of valuation. Thus, to the extent the lead opinion disclaims it, that disclaimer is inconsistent with the lead opinion's justification for continued use of the GIM—it is a generally accepted method of valuation.

¶ 74. In sum, the lead opinion's carte blanche approval of the GIM fails to recognize that the GIM has certain inherent flaws which may call into question its use in particular cases. In granting just compensation based on a GIM valuation, the State may actually be paying for items which are not compensable as a matter of law.

¶ 75. While I do not believe remand on this issue is necessary in this particular case, as a general rule I would require circuit courts to first scrutinize proffers of GIM valuations to determine whether the GIM valuation includes compensation for items not compensable as a matter of law. In such cases, the GIM valuation cannot go to the jury. Moreover, I also emphasize that

the cost approach is an acceptable method of valuation in most cases.

¶ 76. While I write separately for the reasons discussed above, I join the lead opinion in declaring Wis. Stat. ch. 84 to be the exclusive statutory means of pursuing just compensation and join the lead opinion's determination that Vivid is not statutorily entitled to attorney's fees. Accordingly, I respectfully concur.

¶ 77. I am authorized to state that Chief Justice Shirley S. Abrahamson, Justice Donald W. Steinmetz, and Justice Janine P. Geske join this opinion.