SWAN SALES CORPORATION, a domestic corporation,
Plaintiff-Appellant,

v.

JOS. SCHLITZ BREWING COMPANY, a domestic corporation, Defendant-Respondent.

Court of Appeals

*No. 85-0076. Submitted on briefs July 2, 1985.—*
*Decided August 21, 1985.*
(Also reported in 374 N.W.2d 640.)

For the plaintiff-appellant the cause was submitted on the briefs of *Herbon, McLaughlin & Herbon,* with *Ellis R. Herbon* of counsel, of Milwaukee.

For the defendant-respondent the cause was submitted on the briefs of *Godfrey & Kahn, S.C.,* with *William H. Levit, Jr.,* of counsel, of Milwaukee.

Before Wedemeyer, P.J., Moser and Sullivan, JJ.

MOSER, J.   Swan Sales Corporation (Swan) appeals from an order denying its motion to compel discovery. Swan also appeals the trial court's summary judgment

for the Jos. Schlitz Brewing Company (Schlitz). We affirm on both issues.

The subject of this action is an agreement entered into by Swan and Schlitz on May 22, 1962. The letter agreement provided that Swan would perform promotional and merchandising services for Schlitz in connection with beer sales to the American military in the following countries: United Kingdom, France, Spain, Italy, Sicily, Crete, Libya, Morocco, Turkey, Azores, Germany and Greece. The agreement spelled out Swan's duties and provided for payment to Swan of a per case "Service Allowance," or commission. It also provided that it could be terminated at any time by either party by giving written notice to the other party.

In the course of Swan and Schlitz's twenty-year business relationship, modifications were made to the agreement in four general areas: (1) addition of countries to Swan's promotional and merchandising responsibilities; (2) deletion of countries; (3) increase in the per case commission paid to Swan; and (4) addition of beer products to the ones Swan promoted to the military. In particular, Schlitz made several modifications between 1974 and 1979 that are pertinent to this appeal. All modifications in the agreement were made in writing by letter from Schlitz to Swan.

On September 1, 1982, Schlitz gave written notice to Swan that it was terminating the letter agreement between the parties on September 30, 1982. Swan brought the instant action claiming that the letter agreement and its later modifications constituted a "dealership" within the meaning of ch. 135, Stats., the Wisconsin Fair Dealership Law (WFDL). Swan claimed that because Schlitz did not terminate Swan for good cause, and because Schlitz failed to give Swan statutory notice and an opportunity to cure its inadequate performance, Schlitz violated the WFDL and was liable for damages and attorney fees. The trial court granted

Schlitz's motion to dismiss the complaint, but treated that motion as one for summary judgment.[1] The court also denied Swan's motion to compel discovery of Schlitz's privileged and work product documents. Swan appeals.

We turn first to the summary judgment issue. Swan argues that the trial court erred in granting summary judgment, as there exist disputed material facts sufficient to entitle Swan to a trial on the merits. We disagree.

Summary judgment is appropriate where the pleadings, depositions, affidavits and other papers on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.[2] In reviewing a trial court's grant of summary judgment, this court must apply the standards set forth in sec. 802.08, Stats., in the same manner as the trial court.[3]

Reviewing the documents marshaled in support of and in opposition to summary judgment, we, like the trial court, can find no issue as to any material fact. In its motion to dismiss, Schlitz admits that both the letter agreement and the modifications thereto occurred. Swan asserts that factual issues exist regarding the

[1] In support of Schlitz's motion to dismiss, the trial court considered the affidavit of William H. Beyer, a corporate attorney for The Stroh Brewery Co., and the attached letter agreement and modification letters. As these were documents outside of the pleadings, the court properly treated the motion to dismiss as a motion for summary judgment. *See* secs. 802.06(2) and 802.08(2), Stats.

[2] Sec. 802.08(2), Stats; *Juneau Square Corp. v. First Wisconsin Nat'l Bank*, 122 Wis. 2d 673, 681, 364 N.W.2d 164, 168–69 (Ct. App. 1985).

[3] *Garrett v. City of New Berlin*, 122 Wis. 2d 223, 228, 362 N.W.2d 137, 140 (1985); *Rach v. Kleiber*, 123 Wis. 2d 473, 478, 367 N.W.2d 824, 827 (Ct. App. 1985).

parties' intent, the legal effect of the modifications, and changes originally anticipated by the parties. These are legal questions interpreting the facts under the law and are insufficient to raise a material factual issue.

Since the facts are undisputed, we must determine whether the trial court was correct in granting judgment for Schlitz as a matter of law. Swan contends that the WFDL applies under a correct interpretation of the 1962 letter agreement and its subsequent modifications. Swan argues that since Schlitz failed to comply with the notice and termination requirements of the WFDL, Swan should be compensated for its allegedly unlawful termination. Schlitz submits that the WFDL does not apply because Swan's dealership is not situated in Wisconsin. Schlitz also argues that the WFDL does not apply because modifications of the letter agreement occurring between April 5, 1974, and November 24, 1977, did not rise to the level of a new agreement, nor did changes occurring after November 24, 1977, rise to the status of a "renewal" or "amendment" of the original agreement needed for the WFDL to apply.

The Wisconsin Fair Dealership Law was enacted in 1973 to protect dealers against unfair treatment by grantors, and to provide dealers with rights and remedies in addition to those existing by contract or common law.[4] Section 135.02(2), Stats., defines a "dealer" as "a person who is a grantee of a dealership situated in this state." The trial court held that this statutory definition was "not free from ambiguity," and, after looking at the pertinent legislative history, determined that the legislature intended that the dealership, rather than the dealer, has to be situated in Wisconsin. Swan did no business for Schlitz in Wisconsin, but rather represented Schlitz to the military overseas. For that reason, the trial court held that Swan's dealership was not located

---

[4] *See* sec. 135.025(2)(b) and (c), Stats.

in Wisconsin and that the dealer-protective provisions of the WFDL were inapplicable.

A statute is ambiguous when it is capable of being interpreted by reasonably well-informed persons in either of two or more senses.[5] If, after looking at the plain meaning of the statute, it is still ambiguous, courts may properly resort to legislative history in order to determine legislative intent.[6] We need not defer to the trial court in interpreting an ambiguous statute.[7]

In reading the above definition of "dealer," a reasonably well-informed person might interpret it to mean either that the grantee (dealer) must be located in Wisconsin or that the dealership must be situated in Wisconsin. The definition of "dealer" under the WFDL is thus ambiguous, and we turn to the legislative history for elucidation.

Originally, the 1977 bill amending the WFDL included no geographical limitations. The issue of restricting the WFDL to Wisconsin dealerships was first raised by the drafting legislative attorney. In a drafter's note the attorney recommended that to ensure that the law covered only Wisconsin dealerships, the definition of dealership be changed or restrictions be placed in other sections of the statutes where dealer or dealership was mentioned.

Senator Thomas Petri then proposed Senate Amendment 1 to the proposed bill which would have limited the definition of dealership to "a contract . . . by which a person in this state is granted the right to sell or

---

[5] *Foerster, Inc. v. Atlas Metal Parts Co.*, 105 Wis. 2d 17, 22, 313 N.W.2d 60, 62 (1981).

[6] *State ex rel. E.R. v. Flynn*, 88 Wis. 2d 37, 42, 276 N.W.2d 313, 316 (Ct. App. 1979); *Foerster, supra* note 5, at 23, 313 N.W. 2d at 63.

[7] *Manor v. Hanson*, 123 Wis. 2d 524, 533, 368 N.W.2d 41, 45 (1985).

distribute goods." The Senate Commerce Committee solicited a suggestion from Assemblyman Thomas Hauke, the sponsor of the amending bill in the Assembly. Assemblyman Hauke sent a letter prepared at his request by attorney William F. Nelson (Nelson) suggesting language which would ensure "the WFDL only be applicable to Wisconsin dealers." Nelson's letter stated in part:

1. Amendment to make bill applicable only to Wisconsin dealers.

If the bill is to be amended in such a fashion as to be applicable only to dealerships situated within the state of Wisconsin, I would suggest that this would be done by modifying 135.02(5) in the following fashion:

"Dealer" means a person who is a grantee of a dealership, situated in the state of Wisconsin.

The underlined language would constitute the addition to the existing statutory language. (Emphasis in original).[8]

The Senate Commerce Committee adopted Nelson's suggestion rather than Senator Petri's proposed amendment, changing the language only to read "dealership situated in this state."

This, then, clearly establishes the legislature's intent to make the WFDL apply exclusively to dealerships that do business within the geographic confines of the state of Wisconsin. Since Swan only did business for Schlitz overseas, the trial court was correct in determining that this agreement does not come within the terms of the WFDL. The subject matter of this agreement is not "situated in this state."

Swan next contends that the modifications of the 1962 letter agreement between it and Schlitz were substantial enough to either renew or amend the con-

---

[8] This letter is found in the Legislative Reference Bureau file to 1977 Assembly Bill 218, at Madison.

tract so as to bring it under the post-1977 WFDL. We disagree.

Initially, the WFDL expressly applied only to contracts entered into after April 5, 1974, the effective date of the Act.[9] In 1977, however, this express prospective language was deleted in favor of the current expression of purpose and legislative construction as found in sec. 135.025(2)(d), Stats: "(2) The underlying purposes and policies of this chapter are: . . . (d) To govern all dealerships, *including any renewals or amendments,* to the full extent consistent with the constitutions of this state and the United States." (Emphasis added.) Our supreme court in *Wipperfurth v. U-Haul Co.* held that this 1977 amendment could not constitutionally apply the WFDL retroactively to agreements entered into prior to the statute's effective date. The court reasoned that retroactive application would impair the obligation of contracts in violation of U.S. Const. art. I, sec. 10, cl. 1.[10]

Whether an agreement purporting to be a dealership falls under the WFDL, then, depends on two sets of dates. From April 5, 1974, to November 24, 1977, the WFDL covered only *new* agreements entered into between those two dates.[11] After November 24, 1977, a renewal *or* amendment of an agreement antedating the WFDL is sufficient to bring the renewed or amended agreement under WFDL coverage. Of course, the WFDL will also apply to a new agreement entered into after November 24, 1977.

---

[9] *See* former sec. 135.03, Stats. (1973), enacted by ch. 179, Laws of 1973, which stated that the WFDL covered all "dealership" agreements "entered into after the effective date of this Act [April 5, 1974]." *See also Wipperfurth v. U-Haul Co.,* 101 Wis. 2d 586, 588, 304 N.W.2d 767, 768 (1981).

[10] *Wipperfurth, supra* note 9, at 598–99, 304 N.W.2d at 773. U.S. Const. art. I, sec. 10, cl. 1 provides that "No state shall . . . pass any . . . law impairing the obligation of contracts . . . ."

[11] Sec. 135.03, Stats. (1973).

Swan contends that each of the following modifications to the letter agreement transforms it into a new agreement mandating WFDL coverage:

(1) July 3, 1974: Puerto Rico added;
(2) November 15, 1974: Iran eliminated;
(3) November 21, 1975: a new product line, Schlitz Light, added;
(4) February 15 and 22, 1979: civilian United Kingdom market eliminated; and
(5) September 25, 1979: agent's responsibility criteria added.[12]

In addition, Swan argues that the latter two modifications are "amendments" sufficiently substantial to bring the amended letter agreement under the 1977 amendment. We disagree.

Although the WFDL was intended to be literally applied,[13]

[the] direction by the legislature to the courts to construe and apply the statute liberally does not mean that the boundaries of its coverage should be construed expansively. That is to say, the legislature has acted to protect "dealers" from "grantors" rather zealously, particularly with respect to the continuation of "dealerships." If a relationship is a dealership, the protections afforded the dealer are to be construed and applied liberally to the dealer. But the statute itself undertakes to draw a line to encompass the kinds of enterprises and relationships which are to enjoy such protection. There is no basis upon which the courts can provide that

---

[12] It is undisputed that there were 15 modification letters during the parties' business relationship, with the following dates: Dec. 5, 1962; Mar. 22, 1965; Apr. 7, 1965; Feb. 24, 1967; Jan. 22, 1968; Mar. 29, 1968; Dec. 18, 1973; Feb. 1, 1974; Feb. 4, 1974; July 3, 1974; Nov. 15, 1974; Nov. 21, 1975; Apr. 23, 1976; and Feb. 15 and 22, 1979. The parties disagree somewhat, however, as to which modification letters are legally significant.

[13] *See* sec. 135.025(1), Stats; *see Reinders Bros., Inc. v. Rain Bird Eastern Sales Corp.,* 627 F.2d 44, 50 (7th Cir. 1980).

protection to enterprises and relationships which fall without the legislative line.[14]

The 1974 and 1975 modifications to the letter agreement do not repeal it. Indeed, two of the modification letters dated July 3, 1974, and November 21, 1975, which were signed by both parties, explicitly state that they are "an addition and addendum to [the] appointment letter dated May 22, 1962," and that "[t]his appointment is subject to the same conditions with reference to allowance payments and termination as outlined in the May 22, 1962 appointment letter." This language in itself is enough to establish that the parties did not intend the formation of a new agreement each time a product line was added or a territory added or dropped.

Case law also supports this conclusion. In *E.A. Dickinson & Associates v. Simpson Electric Co.*,[15] a 1956 agreement was amended in June, 1974 to add a new product line. Chief Judge John W. Reynolds stated that the addition was neither a "substantial addition" to the agreement, nor was it "an uncommon type of event in the history of the relationship between the parties."[16] Rather, "[i]t was anticipated by the parties in 1956 at the time of their oral agreement that such changes would occur from time to time, and in the course of their twenty-five years of dealings a number of such modifications did occur."[17] Thus, it was a "routine modification" that "did not constitute a renewal or amendment of the contract existing between the parties."[18]

[14] *Kania v. Airborne Freight Corp.*, 99 Wis. 2d 746, 775, 300 N.W.2d 63, 76 (1981), quoting with approval from *H. Phillips Co. v. Brown-Forman Distillers Corp.*, 483 F. Supp. 1289, 1291 (W.D. Wis. 1980) (construing the WFDL).

[15] 509 F. Supp. 1241 (E.D. Wis. 1981).

[16] *Id.* at 1243.

[17] *Id.* at 1247.

[18] *Id.*

Similarly, in *Rochester v. Royal Appliance Manufacturing Co.*,[19] the district court held that as a matter of law a voluntary relinquishment of territory by the dealer did not amount to the making of a new agreement. In *Rochester* the original contract occurred sometime prior to 1970; in 1976 the dealer voluntarily surrendered the right to distribute Royal products in the eastern half of Wisconsin. The court noted that "[t]he voluntariness of the territory change in 1976 further undercuts the contention of plaintiff that the change was an amendment to the dealership."[20]

The parties in this case did not enter into a new dealership agreement when plaintiff relinquished part of his territory. While this change may have been substantial to the plaintiff, it is not equivalent to the kind of changes contemplated by the *Kealey* decision. Rather than making a "fresh decision" whether to continue plaintiff as a distributor, the parties continued the pre-existing relationship, albeit on a smaller scale.[21]

On the other hand, the new contracts dated August 21, 1974, and June 7, 1976, for two plaintiffs in *Kealey Pharmacy & Home Care Service, Inc. v. Walgreen Co.*, "were not simply automatic renewals of the prior contracts; they represented a significant alteration of the relationship between the parties."[22] The new contracts contained no language stating that they were renewals of earlier agreements; they also added and deleted some trade names, and increased the dealers' minimum yearly purchase requirement. In each case the Walgreen Co. was making a "fresh decision" whether to appoint these two prior dealers as Walgreen agencies.[23]

---

[19] 569 F. Supp. 736, 739 (W.D. Wis. 1983).

[20] *Id.* at 740 n. 1.

[21] *Id.* at 739.

[22] 539 F. Supp. 1357, 1363 (W.D. Wis. 1982), *aff'd in part and vacated in part*, 761 F.2d 345 (1985).

[23] *Id.*, 539 F. Supp. at 1363.

Unlike the Walgreen Co. in *Kealey,* Schlitz did not make a "fresh decision" at the time of the 1974 and 1975 modifications to reappoint Swan as its representative to the American military overseas. Schlitz treated the modifications as "addition[s] and addendum[s]" "subject to the same conditions" in the 1962 agreement. By signing the modification letters, Swan concurred in this language and cannot now argue that it signals a new agreement. At any rate, under *E.A. Dickinson* and *Rochester,* neither the addition of new product lines or territories nor the deletion of territories is sufficient to constitute a new agreement, since Swan and Schlitz anticipated that changes like these would be made from time to time in the course of their business relationship, as is evident from the many other modification letters exchanged between the parties.

In the same vein, the 1979 modifications do not transform the 1962 agreement into a new agreement by either renewal or amendment. The February 15 and 22, 1979, letters divesting Swan of its civilian United Kingdom territory do not expressly state that the old agreement was still in force. The deletion of this territory, however, comprises only two terse lines in Schlitz's two-page letter, which also dealt with other administrative details, and thus cannot be said to be a "fresh decision" on Schlitz's part to form a new agreement with Swan.

The September 25, 1979, Schlitz letter with the attached list of "Military Agent Responsibilities" does not modify the 1962 agreement. The letter states that the list "was not new to [Swan] as it had been provided to [Swan] during the early sixties" and that "its contents are the basics of our business relationship" and Swan has "had full knowledge of same for many years."

Although the former president of Swan, Charles Schuster (Schuster), testified at his deposition that the "Military Agent Responsibilities" substantially changed

Swan's prior duties, the record shows the contrary. Swan's predecessor corporation, Swan Sales Co., also represented Schlitz to the overseas American military in the early 1960's. One of Schlitz's exhibits attached to Schuster's deposition is a letter dated July 10, 1961, from Schlitz to Schuster's former partner. The letter indicates that a copy was sent to Swan Sales Co.'s Milwaukee office, where Schuster was located. Schuster testified that "presumably" he got a copy of the letter. This letter includes a list of the former Swan Sales Co.'s duties and responsibilities. The July 10, 1961, list of duties is almost identical to the September 25, 1979, list of "Military Agent Responsibilities." Schlitz correctly contends that the 1979 list of responsibilities was not new and that Swan had knowledge of it for many years. The September 25, 1979, letter with the attached responsibilities list thus did not renew or amend the original 1962 agreement so as to bring it under coverage of the WFDL. Therefore, summary judgment was proper because there is no issue of material fact and the WFDL does not apply.

Swan next argues that the trial court abused its discretion in limiting initial discovery to the issues raised in Schlitz's summary judgment motion. The standard of review of a discovery order is whether the trial court abused its discretion.[24] The appellant has the burden of showing that the trial court abused its discretion, and this court will not reverse unless such abuse is clearly shown.[25]

Swan sought broad discovery on the collateral issue of Schlitz's overcharging AAFES and NAVRESSO, the military overseas suppliers who dealt with Swan. Swan

[24] *Earl v. Gulf & Western Mfg. Co.*, 123 Wis. 2d 200, 204, 366 N.W.2d 160, 163 (Ct. App. 1985).

[25] *Fanshaw v. Medical Protective Ass'n*, 52 Wis. 2d 234, 240, 190 N.W.2d 155, 159 (1971).

contends that discovery on the overcharging issue may have led to evidence bearing on the summary judgment issues. Swan also asserts that such discovery may have allowed it to amend its complaint to allege Schlitz's negligence or bad faith. The record reflects that in its interrogatories to Swan, Schlitz asked what percent Schlitz's sales were of Swan's total sales volume. Schlitz was attempting to prove that Schlitz was such a small percentage of Swan's total sales that Swan was not a Schlitz dealer. In an effort to show that Swan's sales of Schlitz were down due to the overpricing situation, Swan sought discovery on the overpricing. Since Schlitz abandoned this argument on summary judgment, the trial court held that Swan could not inquire into the overpricing as it was not relevant to the motion under sec. 804.01, Stats. The trial court did not preclude Swan from later conducting more extensive pretrial discovery if it survived summary judgment.

Swan has not persuaded us that the trial court's decision to restrict discovery was not rational. Since Schlitz did not pursue the sales volume argument on summary judgment, the overpricing issue was irrelevant for the purposes of that motion. There is a slim chance that broadened discovery might have led to evidence bearing on the summary judgment issues, but there is a great chance that broad discovery would be a waste of time, since summary judgment for Schlitz would moot the remaining issues. Swan was also not absolutely precluded from conducting discovery on the overcharge issue, but rather had to postpone additional discovery pending the outcome of the summary judgment motion. Postponement of discovery, however, is not tantamount to denial of discovery. The Seventh Circuit Court of Appeals recently stated that a trial court has the power and in some cases the duty "to defer a burdensome discovery request pending completion of discovery on an

issue that may dispose of the entire case and thereby make the request moot. We are speaking here only of postponement, and not of denial, of discovery."[26] The trial court thus did not abuse its discretion.

Lastly, Swan challenges the trial court's ruling that documents used by William Beyer (Beyer), house counsel for The Stroh Brewery Co.,[27] to prepare himself for a deposition were either privileged under the attorney-client privilege, sec. 905.03(2), Stats.,[28] or were immune from discovery under the work product doctrine, sec. 804.01(2)(c)1, Stats.[29] Swan argues that by offering

[26] *Marrese v. American Academy of Orthopaedic Surgeons*, 706 F.2d 1488, 1497 (7th Cir 1983) (construing Fed. R. Civ. P. 26(c) & (d), the federal analog of sec. 804.01(2), Stats.), *vacated on other grounds on reh'g en banc*, 726 F.2d 1150 (7th Cir 1984), *rev'd on other grounds*, 105 S. Ct. 1327 (1985).

[27] The Stroh Brewery Co. currently owns all the issued and outstanding shares of the former Jos. Schlitz Brewing Co., and is Schlitz's corporate successor.

[28] Sec. 905.03(2), Stats., reads as follows:

General Rule of Privilege. A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client: (a) between himself or his representative and his lawyer or his lawyer's representative, or (b) between his lawyer and the lawyer's representative, or (c) by him or his lawyer to a lawyer representing another in a matter of common interest, or (d) between representatives of the client or between the client and a representative of the client, or (e) between lawyers representing the client.

[29] *Sec. 804.01(2)(c)1, Stats.,* states that:

(c) *Trial preparation: materials.* 1. Subject to par. (d) a party may obtain discovery of documents and tangible things otherwise discoverable under par. (a) and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including an attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the case and that the party seeking discovery is unable without undue hardship to obtain the

himself as a fact witness in the deposition and in an affidavit in support of summary judgment setting forth Schlitz's version of the agreement, attorney Beyer effectively waived the attorney-client privilege as to any documents he reviewed while informing himself of the facts of the case. Swan also contends that because the case concerns a number of documents comprising the alleged dealership agreement, it should have an opportunity to review Schlitz's documents and determine for itself which ones are pertinent to the agreement at hand.

We have reviewed the documents at issue and agree with the trial court that they are nondiscoverable privileged and work product documents. While privileged documents are absolutely immune from discovery, work product material is subject to production only when the moving party demonstrates "substantial need" for the materials and that it is unable without undue hardship to obtain the substantial equivalent of the materials by other means. Whether work product material must be produced is a matter of discretion for the trial court.[30] We are not satisfied that the trial court abused its discretion in refusing to order Schlitz to produce the work product documents.

In addition, the mere fact that an attorney offers him- or herself as a witness does not automatically waive the attorney-client privilege or work product doctrine as to documents reviewed by the attorney in preparing to testify. We note that these privileges are owned by the attorney's client and can only be waived voluntarily at

_____

substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.

[30] *Shibilski v. St. Joseph's Hosp.*, 83 Wis. 2d 459, 470, 266 N.W.2d 264, 269 (1978).

the client's direction.[31] Because Schlitz has not waived the attorney-client privilege in this case, attorney Beyer's affidavit or deposition testimony does not function as a waiver.

For the foregoing reasons, we affirm the trial court's order and judgment in all respects.

*By the Court.*—Order and judgment affirmed.

---

[31] *See* secs. 905.03 and 905.11, Stats.