Bruce W. RADEMANN and Oakfield Stone Company, Inc., a domestic corporation, Plaintiffs-Appellants,†

v.

STATE OF WISCONSIN DEPARTMENT OF TRANSPORTATION, Defendant-Respondent.

Court of Appeals

*No. 00–2995. Oral argument January 17, 2002.—Decided February 20, 2002.*

2002 WI App 59

(Also reported in 642 N.W.2d 600.)

† Petition to review denied 5-21-02.

On behalf of the plaintiffs-appellants, the cause was submitted on the briefs of *Benjamin Southwick* of Richland Center and *Russell J. Reff* of *Reff, Baivier, Bermingham, Zierdt & Lim, S.C.* of Oshkosh. There was oral argument by *Benjamin Southwick*.

On behalf of the defendant-respondent, the cause was submitted on the brief of *Sandra L. Tarver*, assistant attorney general, and *James E. Doyle*, attorney general. There was oral argument by *Kathleen M. Ptacek*, assistant attorney general.

Before Nettesheim, P.J., Brown and Snyder, JJ.

¶ 1. SNYDER, J. Bruce W. Rademann, as president of Oakfield Stone Company, Inc. (Oakfield) appeals a judgment awarding the Department of Transportation (Department) $302,500, the difference between the trial court's verdict in Rademann's condemnation case ($57,500) and the basic award Rademann received from the Department before trial ($360,000). Rademann argues that the trial court erroneously exercised its discretion when it (1) held that the market approach to appraisal of the subject properties was admissible; (2) barred the use of the income approach to appraisal of the subject properties; (3) prevented Rademann from discovering a purchase contract related to the sale of the Fond du Lac Stone Company; and (4) held that the three parcels at issue should be considered as one parcel and that the middle parcel was not landlocked after the taking. We conclude that the trial court reasonably exercised its discretion as to all of these issues and affirm the judgment.

## FACTS[1]

¶ 2. Rademann and Oakfield were adjacent owners of certain real estate located in the town of Byron in Fond du Lac county. The parcels at issue included Old Parcel #19, Old Parcel #20 and Old Parcel #24. Old

---

[1] For the purposes of this appeal, the facts have, for the most part, been gleaned from Rademann's briefs. The Department did not provide a separate factual recitation in its brief but instead includes facts within each of its separate argument sections. Rademann has not provided consistent and consistently accurate citations to the record to corroborate the facts set out in his briefs. Such failure is a violation of WIS. STAT. RULE 809.19(1)(d) and (3) (1999–2000) of the rules of appellate

197

Parcel #19 was the western-most parcel containing 8.09 acres and owned by Oakfield since August 1985. Old Parcel #20 was the middle parcel containing 26.68 acres and owned by Rademann since June 26, 1991. Old Parcel #24 is the eastern-most parcel containing 37.97 acres and owned by Oakfield since June 23, 1989.

¶ 3. Old Parcel #20, the middle parcel, contained an active, operating, fully-permitted quarry from which building stone, or dimension stone, was quarried. To the west, Old Parcel #19 contained some buildings which were used in this quarrying operation. To the east, Old Parcel #24 contained a deposit of building stone beneath its surface and had all the necessary permits for quarrying; however, quarrying operations had not commenced on Old Parcel #24 at the time of the taking.

¶ 4. The Department exercised its power of eminent domain under Wis. Stat. § 32.05 and acquired a

---

procedure which requires parties to set out facts "relevant to the issues presented for review, with appropriate references to the record." We therefore hold the parties to those facts set forth in their briefs.

Furthermore, while the trial court took great pains to compile a clean and understandable record ("I pity the court of appeals trying to follow this" and "I'm very sensitive to making a good record and having them have access to these matters versus trying to go through a foot and a half worth of materials"), the voluminous record in this case was compiled backwards and therefore extremely difficult to utilize for reference. It is the appellant's responsibility to ensure that the record is sufficient to facilitate appellate review. *See Seltrecht v. Bremer*, 214 Wis. 2d 110, 125, 571 N.W.2d 686 (Ct. App. 1997).

All references to the Wisconsin Statutes are to the 1999–2000 version unless otherwise noted.

portion of all three parcels for highway improvement purposes. The Department took title to a total of approximately ten acres from all three separate parcels. The Department obtained appraisal reports from professional appraisers prior to issuing its Award of Damages. Appraiser J. Martin Hogan, Jr. and review appraiser Michael A. Pitts appraised Old Parcel #20 using an income approach and concluded that just compensation was $229,800. Appraiser Robert E. Davies, using an income approach, concluded that just compensation for the taking of a portion of all three parcels was $331,000. Appraiser Curt G. Olson concluded that just compensation for the taking of a portion of all three parcels was $360,000. Olson valued the deposit stone in Old Parcel #20 using a capitalization of royalties version of the income approach and valued the underlying land using a market approach.

¶ 5. The Department paid $360,000 as its Award of Damages, thereby adopting Olson's conclusion, and recorded its Award of Damages on March 15, 1996.

¶ 6. Rademann and Oakfield filed an appeal from the Award of Damages on July 19, 1996. The sole issue in the appeal was the amount of just compensation that the Department must pay to Rademann for its partial taking from each of the three parcels.

¶ 7. Rademann retained Craig Hungerford as an appraiser. Hungerford used a capitalization of royalties version of the income approach to appraisal and in his final appraisal report concluded that just compensation for the taking from the three parcels was $3,860,000. The Department obtained David L. Gagnow as its appraiser for trial. Gagnow appraised the three parcels using the market approach and concluded that just compensation for the taking from the three parcels was $57,500.

¶ 8. Rademann and Oakfield filed several pretrial motions; Rademann and Oakfield filed a motion to trifurcate the trial, asking for a separate trial for each of the three parcels. The trial court ruled that this issue had not been timely raised. Rademann also moved to have Old Parcel #20 declared landlocked as a result of the taking. The trial court held that the three parcels should be considered as one parcel for the purposes of this litigation.

¶ 9. Rademann also filed a motion to bar the use of the market approach to appraisal of the three parcels. The Department filed a simultaneous motion to bar the use of the income approach of appraisal at trial. The trial court ruled in favor of the. Department, allowing the use of the market approach and barring the use of the income approach.[2] After the trial court prohibited the use of the income approach and only allowed use of the market approach to appraisal, Hungerford, Rademann's appraiser, issued a second report in which he concluded that he could not reach a conclusion to a reasonable degree of appraisal certainty regarding just compensation relying on the market, or comparable sales, approach.

¶ 10. Rademann then sought information relating to the sale of a different quarry operation. In 1997, Michels Pipeline Construction Company (Michels) purchased a building stone quarry business known as Fond du Lac Stone Company via a stock transfer. Rademann issued subpoenas duces tecum to take depositions of the principals to the stock transaction, commanding the witnesses to bring with them any and all documents related to the terms of the transaction. The Depart-

[2] Rademann unsuccessfully sought an interlocutory appeal of this ruling.

ment filed a motion to bar Rademann from obtaining a copy of a purchase contract relating to that sale and from discovering the details of that transaction.

¶ 11. The trial court agreed with Rademann that if the parties to the stock sale had placed an independent fair market value on the real estate, that information would be relevant. However, the trial court also noted that unless the parties placed an independent value on the real estate, the information would be irrelevant income evidence as the sale was via a stock transfer. Initially, the trial court denied the Department's motions but limited Rademann's inquiry to whether or not any monetary value was placed on the real estate during negotiations. An executive from Fond du Lac Stone Company testified during depositions that there was never any discussion during negotiations of purchasing the real estate separately, there was no separate allocation of value for the real estate and no appraisals of the real estate had been done. Because no independent value had been placed on the real estate, per the trial court's ruling any information relating to the stock transfer was considered irrelevant income evidence and inadmissible. Rademann then filed a motion to compel Michels to produce a copy of the purchase contract for the trial court to review in camera. The trial court denied this motion on September 16, 1999.

¶ 12. After disposing of these motions, the parties stipulated to waiving a jury trial and the just compensation issue was tried to the court. After trial, the court awarded compensation of $57,500 to Rademann based on the opinion of the Department's appraiser. Because the Department had paid Rademann $360,000 as its Award of Damages, the final judgment reflected a pay-back by Rademann to the Department of $302,500

plus interest. The trial court also awarded the Department its taxable costs and disbursements. Rademann then commenced this appeal. Further facts will be provided in this decision as necessary.

## DISCUSSION

¶ 13. The sole issues to be tried in an eminent domain case are questions of title and just compensation. WIS. STAT. § 32.05(11). Here we address only the issue of just compensation. The rules that govern the determination of just compensation are provided in WIS. STAT. § 32.09. In a partial takings case, like the one here, the measure of just compensation is the difference between the fair market value of the whole property before the taking and the fair market value of the remaining property immediately after the taking. Sec. 32.09(6); *Besnah v. City of Fond du Lac*, 35 Wis. 2d 755, 758, 151 N.W.2d 725 (1967).

¶ 14. Rademann makes four arguments on appeal: (1) the trial court erred in holding that the market approach to appraisal of the subject properties was admissible; (2) the trial court erred in barring the using of the income approach to appraisal of the subject properties; (3) the trial court erred in preventing Rademann from discovering a purchase contract related to the sale of the Fond du Lac Stone Company; and (4) the trial court erred by holding that the three parcels should be considered as one parcel and Old Parcel #20 was not landlocked after the taking.

¶ 15. The admission of evidence regarding fair market value in condemnation cases is left to the trial court's discretion. *Calaway v. Brown County*, 202 Wis.

2d 736, 741, 553 N.W.2d 809 (Ct. App. 1996). The burden of showing an unreasonable exercise of discretion rests upon the party challenging the trial court's exclusion of that evidence. *Id*. Here, that burden rests upon Rademann. Each of Rademann's arguments will be addressed separately.

## *Market Value Approach*

¶ 16. Rademann contends that the trial court erred when it admitted evidence of market sales offered by the Department. Rademann argues that the sales utilized were not comparable and therefore not relevant to fair market value. We disagree.

¶ 17. Sales of comparable property may be considered as a basis for determining fair market value. WIS. STAT. § 32.09(1m). A sale is comparable "if it was made within a reasonable time before or after the date of evaluation and the property is sufficiently similar in the relevant market, with respect to situation, usability, improvements and other characteristics, to warrant a reasonable belief that it is comparable to the property being valued." *Id*.

¶ 18. Comparable sales evidence is admissible as either independent direct evidence of the land's value or for the limited indirect purpose of demonstrating a basis for and giving weight to an expert opinion. *Calaway*, 202 Wis. 2d at 741. The general rule regarding admission of comparable sales as direct evidence of value is more restrictive than the admissibility rule when the evidence is offered only to show a basis for the opinion of an expert witness. *Id*. Here, the trial court

found that the evidence of comparable sales was offered only as a basis for Gagnow's opinion, implicating the less restrictive standard.

¶ 19. The question of whether comparable sales are to be admitted is within the discretion of the trial court. *Leathem Smith Lodge, Inc. v. State*, 94 Wis. 2d 406, 415, 288 N.W.2d 808 (1980). Where the evidence is offered as the basis for an expert's opinion, the extent to which the offered sales are truly comparable goes to the weight of the expert's testimony and not to admissibility. *Weeden v. City of Beloit*, 29 Wis. 2d 662, 668, 139 N.W.2d 616 (1966).

¶ 20. A trial court's determination of the acceptability of sales as comparables will not be reversed in the absence of clear error. *Id*. When we are asked to review such discretionary rulings, "we look not to see if we agree with the circuit court's determination, but rather whether 'the trial court exercised its discretion in accordance with accepted legal standards and in accordance with the fact[s] of record.'" *Vivid, Inc. v. Fiedler*, 219 Wis. 2d 764, 794, 580 N.W.2d 644 (1998) (citation omitted). "We must be mindful that the court below passed upon this matter under circumstances more favorable for arriving at a just result than are afforded here," *Weeden*, 29 Wis. 2d at 666 (citation omitted), and we must search the record for support of the trial court's evidentiary ruling. *Calaway*, 202 Wis. 2d at 744.

¶ 21. Prior to trial, Rademann moved to exclude the Department's selected market sales as evidence of the fair market value of the east 22 acres of Old Parcel #20. Rademann argued that the sales utilized by Gag-

now in his appraisal were not comparable because, save one, soil borings[3] were not done to determine to a reasonable degree of scientific certainty the nature and extent of building stone deposit on each of the properties. The trial court denied Rademann's motion.

¶ 22. The trial court did not misuse its discretion when it admitted evidence of comparable sales. Gagnow researched land sales that were purchased for quarrying purposes. All of the sales were clustered in the towns of Byron, Oakfield, Brotherton and Eden in Fond du Lac county. Buyers of all fourteen comparable properties were known quarry operators. All of the comparable properties contained building stone deposits and all of the sites were adjacent to either existing or old quarries. Five of the sales were active quarries at the time of purchase. In fact, in the majority of the sales, the prices paid for the property were significantly above agricultural land prices, selling for between $1,489 and $10,251 per acre.

¶ 23. Of these fourteen comparable sales, only one sale involved the taking of borings. However, the price paid in that sale, $3,287 per acre, was in accord with the nonboring sales and Gagnow concluded that the presence of borings did not make a discernible difference in the market.

¶ 24. Here, Rademann was given ample opportunity to challenge the comparability of the fourteen sales utilized by Gagnow in appraising the property. Rademann consistently argued that the only way to properly evaluate the land was through use of soil borings and that sales without the benefit of borings are purely

---

[3] According to Rademann, a boring is "a process in which the surface of the earth is drilled into and samples about 10 feet length [sic] are removed for study."

speculative.[4] While Rademann never asked Gagnow about the effect of borings on the comparable sales, Rademann cross-examined Gagnow about specific characteristics of the fourteen sales, such as the mining experience of buyers, the availability of mining permits and applicable zoning laws, the extent of overburden on each property and the specific product being mined (building stone versus aggregate).

¶ 25. In closing arguments, Rademann asserted that because of these differences, and the lack of borings taken, the sales used by Gagnow should be accorded little, if any, weight.[5] The trial court concluded otherwise:

> With respect to Mr. Gagnow, and all of the comparable sales were gone into in great detail as far as buyer, seller, number of acres, price per acre, price in total, zoning, overburden, et cetera. What I found most helpful to the Court here was the general factors or threads that ran through the comparable sales, that being Mr. Gagnow's testimony that building stone was on each comparable seam . . . .

---

[4] Rademann himself admitted that he had never done a boring on a piece of property prior to purchase, as did Rademann's own witness, quarry operator Dennis Buechel.

[5] Gagnow, the State's expert appraiser, was the only expert appraiser who testified as to the value of the property taken. If the trial court were to have accepted Rademann's argument that Gagnow's opinion was of no value, it is unclear what value should have been placed on the subject property as Rademann did not call an expert appraiser and presented no evidence as to the value of the property using the comparable sales method, except for that amount set forth in his closing argument. The burden of proof in eminent domain proceedings on the question of damages rests upon the landowner. *Hietpas v. State*, 24 Wis. 2d 650, 656, 130 N.W.2d 248 (1964).

I also found significant the fact that all of the buyers were known quarry operators. That the parcels were adjacent or the purchase parcels were adjacent to existing or old quarries, that the overburden was minimal, and that the general prices were approximately two to three times agricultural which ties into what Mr. Buechel testified to as far as their general practice.

. . . .

Mr. Southwick first argues that the comparable sales are entitled either to no weight whatsoever or very little weight. The first subargument there is that you do not have the knowledgeable buyer and seller. My first comment would be there's nothing in the record specifically to indicate that the sellers are not knowledgeable generally about what may be below their land subsurface . . . . [T]here's nothing directly in the record in that regard.

Then Mr. Southwick argues that the only way his client, for example, and the other quarry operators can determine with absolute certainty the extent of any subsurface deposits is soil borings. And it's clear here that neither Mr. Buechel nor Mr. Rademann have ever done that prepurchase. But Mr. Southwick argues . . . the Court should hold itself to a higher standard than the standard that the quarry operators set for themselves when they make the purchases.

To my way of thinking, Mr. Buechel and Mr. Rademann have been in the business forever. I mean, these guys know the business. They know what they're doing. They know how to make money in the business. They know how to purchase land. And neither one of them has ever paid anything remotely close to even the $44,000 per acre figure being requested by Mr. Southwick at this juncture of the case. And they make their business decisions not based on borings, not — apparently not having to know the extent of the tonnage and

207

the extent of the subsurface deposits, but rather using either gut instincts or their best judgment . . . looking at the various parcels if there's an open area on it or else based on the assumption that . . . a parcel adjacent to operating quarry generally has the same type of stone on it, and that's borne out by some of the purchases by the various quarries as reflected in the 14 comparable sales.

So to the extent that I'm asked to equate Mr. Rademann and Mr. Buechel and the other quarry owners as in effect ignorant purchasers of these parcels, the record . . . does not support that whatsoever . . . . I tend to agree . . . that the quarry owners set the market, and they do that based on their knowledge and experience, and what they pay is what they pay. To my way of thinking, that is the market. So I disagree with Mr. Southwick's argument that in effect Mr. Rademann and the other quarry owners are in effect ignorant purchasers of this land and the market is actually much different than the market that has been set by virtue of their own purchases . . . .

¶ 26. Whether or not borings were a necessary component to determine comparability goes to the weight, not the admissibility, of the evidence; it is generally a question for the trier of fact to determine whether the proposed factor underlying the opinion of the expert as to the fair market value, here the borings, is one which would have reasonably been considered by a willing buyer and a willing seller. *Weeden*, 29 Wis. 2d at 668; *Volbrecht v. State Highway Comm'n*, 31 Wis. 2d 640, 645, 143 N.W.2d 429 (1966). Rademann was given ample opportunity to challenge the comparability of these fourteen sales with his property. The trial court

did not erroneously exercise its discretion when it found the sales comparable and admitted evidence of market sales.

### Income Approach

¶ 27. Rademann next argues that the trial court erred in barring the admissibility of the income approach to appraisal of the subject properties. We disagree.

¶ 28. As a starting point, it should be noted that income evidence is never admissible where there is evidence of comparable sales. *Leathem Smith*, 94 Wis. 2d at 413. Evidence of net income is ordinarily inadmissible for purposes of establishing property values in condemnation cases involving commercial enterprises because income is dependent upon too many variables to serve as a reliable guide in determining fair market value. *Id.*

¶ 29. Accepting evidence of net profits as a factor to consider in arriving at fair market value necessarily opens the door for an exploration of the accounting methods and systems of operation of the business and raises questions of the efficiency and skill of the operator. *Id.* at 416. Valuation testimony based on income generated by owner-managed property is excluded as overly speculative because it is nearly impossible to ascertain how much of the income can be attributed to the owner's management and the resultant consumer goodwill. *Id.* Income from owner-managed property does not reflect its fair market value because an appraiser cannot predict how good a replacement a poten-

tial buyer might be for the existing owner-manager. *Id.* A recent arm's-length sale of the subject property, or sales of reasonably comparable land, represent the best information with which to determine fair market value. *Waste Mgmt., Inc. v. Kenosha County Bd. of Review*, 184 Wis. 2d 541, 556, 516 N.W.2d 695 (1994).

¶ 30. Rademann argues that *Vivid*, 219 Wis. 2d at 764, modifies the decree of *Leathem Smith* that income evidence is never admissible where there is evidence of comparable sales. According to Rademann, *Vivid* holds that any professionally accepted method of appraisal is admissible in just compensation cases with objections going to the weight, not admissibility, of the evidence. Rademann also argues that *Vivid* sets forth three exceptions to the *Leathem Smith* rule regarding the inadmissibility of income evidence when comparable sales exist: (1) profit is produced without the owner's labor, (2) profits derived from the property's use are its chief source of value, and (3) the property is so unique that comparable sales data is unavailable. *Vivid*, 219 Wis. 2d at 792.

¶ 31. We disagree that *Vivid* so altered the landscape of *Leathem Smith* as to disturb its ruling. These three exceptions set forth in *Vivid* were recognized in *Leathem Smith* as well. However, the issue in *Vivid* was the measure of just compensation for highway billboards under Wis. Stat. § 84.30 (1997–98) and the *Vivid* trial court admitted testimony regarding both the market and the income approach. *Vivid*, 219 Wis. 2d at 769, 772–73. The market approach used a Gross Income Multiplier (GIM)[6] by looking to the sale of reasonably

---

[6] A GIM is a unit of comparison that is determined by dividing the sales price of a group of signs by the annual gross

comparable billboards. *Vivid*, 219 Wis. 2d at 784. *Vivid* speaks only to the valuation of billboards using a GIM.

¶ 32. Again, we will only reverse a trial court's ruling to exclude income evidence if a trial court erroneously exercised its discretion. *See Leathem Smith*, 94 Wis. 2d at 415. In light of the availability of comparable sales, under *Leathem Smith* the trial court acted within its discretion when it excluded the income approach to appraisal of the subject properties.

### *Discovery*

¶ 33. Rademann also argues that the trial court erroneously exercised its discretion when it prevented him from discovering the May 16, 1997 purchase contract related to the corporate stock sale of Fond du Lac Stone Company to Michels Pipeline Construction Company. We disagree.

¶ 34. The standard of review of a discovery order is whether the trial court erroneously exercised its discretion in ordering or prohibiting the discovery. *Earl v. Gulf & W. Mfg. Co.*, 123 Wis. 2d 200, 204, 366 N.W.2d 160 (Ct. App. 1985). Rademann has the burden of establishing that the trial court erroneously exercised its discretion. *Swan Sales Corp. v. Jos. Schlitz Brewing Co.*, 126 Wis. 2d 16, 28, 374 N.W.2d 640 (Ct. App. 1985).

¶ 35. We have already held that the trial court properly concluded that income evidence was inadmissible. Because an executive from Fond du Lac Stone Company testified that there was never any discussion

rental income generated by those signs. *Vivid, Inc. v. Fiedler*, 219 Wis. 2d 764, 784, 580 N.W.2d 644 (1998).

during negotiations of purchasing the real estate sepa-
rately, no appraisals of the real estate had been done
and no independent value had been placed on the real
estate, information relating to the stock sale was irrel-
evant and therefore inadmissible income evidence.
Rademann cites no authority for his contention that he
is entitled to discover this document. We decline to
review arguments unsupported by reference to legal
authority. *State v. Pettit*, 171 Wis. 2d 627, 646, 492
N.W.2d 633 (Ct. App. 1992).

### Three Parcels As One

¶ 36. Finally, Rademann argues that the trial
court erroneously exercised its discretion by holding
that the three parcels at issue should be considered as
one parcel and that Old Parcel #20 was not landlocked
after the taking. The trial court, agreeing with the
Department, held that this motion was untimely. We
concur.

¶ 37. WISCONSIN STAT. § 32.05(5) states in relevant
part:

COURT ACTION TO CONTEST RIGHT OF CONDEMNATION. If an
owner desires to contest the right of the condemnor to
condemn the property described in the jurisdictional
offer, *for any reason other than that the amount of
compensation offered is inadequate*, the owner may
within 40 days from the date of personal service of the
jurisdictional offer or within 40 days from the date of
postmark of the certified mail letter transmitting such
offer, or within 40 days after date of publication of the
jurisdictional offer as to persons for whom such publi-
cation was necessary and was made, commence an
action in the circuit court of the county wherein the
property is located, naming the condemnor as defen-

dant. *Such action shall be the only manner in which any issue other than the amount of just compensation, or other than proceedings to perfect title under ss. 32.11 and 32.12, may be raised pertaining to the condemnation of the property described in the jurisdictional offer . . . . If the action is not commenced within the time limited the owner or other person having any interest in the property shall be barred from raising any such objection in any other manner.* (Emphasis added.)

Thus, § 32.05(5) requires that all issues other than that of just compensation be presented to the trial court within forty days after the owner's receipt of the jurisdictional offer by personal service. *Arrowhead Farms, Inc. v. Dodge County*, 21 Wis. 2d 647, 651, 124 N.W.2d 631 (1963). The Department paid $360,000 as its Award of Damages and recorded its Award of Damages on March 15, 1996. However, Rademann raised these issues in a motion to the court on March 24, 1997, past the forty-day mandate of § 32.05(5).

¶ 38. The property owner may actively participate in every phase of the compensation-fixing process. *Arrowhead Farms*, 21 Wis. 2d at 651. WISCONSIN STAT. § 32.05(5) provides for judicial review of every jurisdictional requirement involved in the process. *Arrowhead Farms*, 21 Wis. 2d at 651. The only obligation upon the property owner is that he or she raise jurisdictional objections in a timely and orderly fashion. *Id.* The matter of just compensation is the crucial issue in any public taking and the statute permits both the administrative body and the trial court to devote full attention to this substantive matter without having the deliberation deflected into consideration of collateral procedural matters by requiring the owner to raise all objections, other than the adequacy of the compensation, within

forty days after receipt of the jurisdictional notice. *Id.* Because Rademann failed to assert this right within forty days, by the terms of § 32.05(5), he is "forever barred from raising any such objection in any other manner." *Arrowhead Farms*, 21 Wis. 2d at 652 (citation omitted).

## CONCLUSION

¶ 39. The trial court did not erroneously exercise its discretion when it admitted evidence of the market approach to appraisal and barred the use of the income approach to appraisal of the subject properties. The trial court did not erroneously exercise its discretion when it prevented Rademann from discovering a purchase contract related to the sale of the Fond du Lac Stone Company. Lastly, the trial court did not erroneously exercise its discretion when it held that Rademann's motion to treat the three parcels at issue as one parcel and determine that the middle parcel was landlocked after the taking was untimely. We conclude that the trial court reasonably exercised its discretion as to all of these issues and affirm the judgment.

*By the Court.*—Judgment affirmed.

¶ 40. BROWN, J. (*dissenting in part; concurring in part*). I disagree that evidence of comparable sales was properly admitted into evidence in this case. As to that part of the majority opinion, I dissent. If the comparable sales evidence was properly admitted, I agree with the majority that *Vivid, Inc. v. Fiedler*, 219 Wis. 2d 764, 580 N.W.2d 644 (1998), is not authority for Rademann to contend that he should be able to submit evidence regarding the income approach even if evi-

dence of comparable sales is also admitted into evidence. But I disagree with the majority's reasoning of why this is so. Therefore, I write separately regarding the meaning of *Vivid*.

## COMPARABLE SALES IN QUARRY OPERATIONS

¶ 41. The majority reasons that the trial court did not misuse its discretion in admitting evidence of comparable sales because the value of Rademann's properties as *quarrying properties* was determined by comparing it with the value of numerous other properties sold as *quarrying properties*. This was the same view held by the trial court. I want to spend some time with not only the facts adduced at trial and the trial court's analysis, but also with Rademann's arguments leading up to the trial court's decision because I think it nicely outlines the precise issue in this case.

¶ 42. The State had presented evidence of sales of quarrying properties in the vicinity of Rademann's property. As the majority opinion details, there were fourteen such properties. All fourteen buyers were known quarry operators. As pointed out by the majority, the prices paid for the properties were significantly above agricultural land prices, selling for between $1,489 and $10,251 per acre. Although five of the quarries were existing quarries when sold, four of the sellers of these properties were not the actual quarry operators. The sellers were farmers who had leased the property to quarry operators. In the fifth instance, the seller—a quarry operator—sold the land to his son. This can hardly be termed as an arm's-length transaction. Based solely on the prices per acre that these

215

comparables sold for, the State's appraiser thus gave his opinion that the value of Rademann's property was $6000 per acre.

¶ 43. Rademann sought to explain to the trial court why it should discount the reliability of these fourteen sales. He argued that quarry property was unique in that its worth was entirely dependent upon the quality and quantity of the subsurface stone. In Rademann's view, the only way one can determine with absolute certainty the extent of any subsurface deposits is with soil borings. Rademann asserted that because there were no soil borings in the comparison properties, the other sales could not be considered true comparisons.

¶ 44. The trial court answered that, according to the evidence before the court, the fourteen properties were all in the same general geographic area as Rademann's property. Therefore, the court could infer that the quality of the stone was the same. The court also pointed to evidence that the custom of the area quarry operators, when acting as buyers, never included taking soil borings prior to purchasing quarrying properties. The court, in particular, mentioned that neither Dennis Buechel, a neighboring quarry operator who testified on Rademann's behalf, nor Rademann himself, ever had used soil borings pre-purchase. In the trial court's view, Rademann was arguing that the court "should hold itself to a higher standard than the standard that the quarry operators set for themselves when they make the purchases." The court observed that Buechel and Rademann had "been in the business forever. I mean, these guys know the business. They know what they're doing. They know how to make

money in the business. They know how to purchase land. And neither one of them has ever paid anything remotely close to even the $44,000 per acre figure being requested . . . ." The court concluded that the "quarry owners set the market, and they do that based on their knowledge and experience, and what they pay is what they pay. To my way of thinking, that is the market."

¶ 45. Rademann responded that it would be wrong to use past history and custom in deciding whether the comparable sales showed the true market value of the neighboring quarry properties. He argued that to do so would fail to take into account the fact that the quarry operators were buying from farmers who had no idea of the real worth of the stone lying beneath the property. Thus, even though the operators paid more to the farmers for the property than the property would have sold for had it been sold for agricultural purposes, the fact of the matter was that the sellers were not knowledgeable and, therefore, the quarry operators were able to buy the property at prices far beneath the actual worth. As an offer of proof, Rademann offered both his testimony and that of his neighboring quarry operator, Buechel. Rademann pointed out that "just compensation" is the fair market value of the property. Rademann argued that fair market value is ordinarily measured as the price the property would bring in the market place in a voluntary sale to a willing and *knowledgeable* buyer from an equally willing and *knowledgeable* seller. Rademann asserted that had the sellers in the comparables been knowledgeable quarry operators, the price of the comparables would have been much higher. Rademann attempted to place a

stock sale of a neighboring quarry operator in evidence as support for his proposition.[1]

¶ 46. The trial court rebuffed Rademann's contention. It said:

> [T]here's nothing in the record specifically to indicate that the sellers are not knowledgeable generally about what may be below their land subsurface. If I'm being asked to infer that because somebody is a farmer or retiree or work at Merc that they have absolutely no knowledge of what may be below the surface, especially if their property's adjacent to other quarriable properties, I'm not willing to make that inference.

¶ 47. In a nutshell, what the trial court was saying is that the comparable sales data showed the sale price of quarried property or property capable of being quarried in the area of the subject sale and that these sales were conducted by knowledgeable sellers and buyers without the benefit of soil borings.

¶ 48. At the outset, I realize that the question of whether comparable sales are to be admitted is within the discretion of the trial court. *Leathem Smith Lodge, Inc. v. State*, 94 Wis. 2d 406, 415, 288 N.W.2d 808 (1980). A trial court's determination of the acceptability of comparable sales will not be reversed in the absence of clear error. *Id*. Accepting as I must this standard of review, I believe there was clear error.

¶ 49. The law regarding comparable sales is best defined in the context of assessment law. In assessing property, the "best information" is the sale of the property itself or if there has been no such sale, then sales of reasonably comparable property. *State ex rel.*

---

[1] The trial court would not permit this evidence. It agreed with the stock buyer that details of the stock transaction were a trade secret and granted a protective order.

*Geipel v. City of Milwaukee*, 68 Wis. 2d 726, 733, 229 N.W.2d 585 (1975). To be considered as a reasonably comparable property, that property must have been sold for its fair market value. Fair market value is consistently defined as "the amount it will sell for upon arms-length negotiation in the open market, between an owner willing but not obliged to sell, and a buyer willing but not obliged to buy." *Darcel, Inc. v. City of Manitowoc Bd. of Review*, 137 Wis. 2d 623, 628, 405 N.W.2d 344 (1987) (citation omitted). Five conditions are necessary for a property to be considered a proper comparable:

1. It must have been exposed to the open market for a period of time typical of the turnover time for the type of property involved.

2. It presumes that both buyer and seller are knowledgeable about the real estate market.

3. It presumes buyer and seller are knowledgeable about the uses, present and potential, of the property.

4. It requires a willing buyer and a willing seller, with neither party compelled to act.

5. Payment for the property is in cash, or typical of normal financing and payment arrangements prevalent in the market for the type of property involved.

*Id.* at 629 (citation omitted).

¶ 50. As we can see from this list of conditions, knowledge of the seller is an important ingredient in determining whether the sale is for fair market value.

¶ 51. I think the trial court could fairly draw the inference that the farmers in the surrounding area

were knowledgeable about the real estate market. And I also think that the farmers were knowledgeable about the use of their land for quarrying. What I think is speculative is for the trial court to assume that the farmers could know the potential worth of the minerals in the subsoil. There is no evidence whatsoever that the farmers in these supposedly comparable sales knew the quantity or quality of the stone on their property. All they knew was that there was stone and that some entity wanted that stone to quarry. They also knew that the entity would pay more for the land than it would normally sell for if it were going to be farmed.

¶ 52. Eminent domain cases involving mineral deposits are more difficult and complex than the more mundane takings of real property. *See, e.g., Tug Valley Recovery Ctr., Inc. v. Mingo County Comm'n*, 261 S.E.2d 165 (W. Va. 1979). The courts are divided as to what the proper approach to value should be—a sales comparison approach, an income approach or a cost approach or some combination. Joseph M. Montano, *Valuation of Lands with Mineral Deposits*, C791 ALI-ABA 269, 273 (1993). I accept that, pursuant to *Leathem Smith*, Wisconsin aligns itself with those jurisdictions favoring the sales comparison approach if available.

¶ 53. But I cite Montano for the following proposition:

> Where comparable sales are available, the process is less complicated. However, adjustment must be made for the differences that exist between the comparable properties and the property being condemned. In addition to the usual adjustments for time and location, etc., adjustment must be made for any difference in the quality and quantity of the minerals. This may require expert testimony.

Montano, *supra,* at 273. Montano went on to describe the problem that may result if the trial court relies only upon the unit price per acre of the comparison properties, as was done here. *Id.* He cautioned that it may not be a proper comparison. He wrote:

> For example, if a property deemed to be comparable sells for $5,000 an acre, it would appear that the subject property is worth $5,000 per acre. But, if upon critical comparison it is determined the quantity of the minerals in the subject are greater on a per acre basis than the comparable, a per acre price comparison leads to an improper result. The proper comparison is to determine the quantity of the minerals and make the adjustment based upon a comparison of quantity. For example, if the comparable property which sold for $5,000 per acre has an estimated quantity of 20,000 tons of sand and gravel per acre and the subject has 50,000 tons per acre, a $5,000 per acre value of the subject would undervalue it. Converting the price to units of tons per acre, i.e. 25,000/$5000 or $.20 per ton, the proper comparison would be to multiply that unit price of $.20 times 50,000, resulting in a value of $10,000 per acre for the subject. Also, the quality of the deposits should be analyzed to determine similarity. Without such an analysis, the properties may not be deemed to be comparable. *United States v. 103.38 Acres of Land,* 660 F.2d 208 (6th Cir. 1981). In any event, expert testimony as hereinafter described, in addition to an expert real estate appraiser would be required if the testimony is to meet the standard required by the courts.

Montano, *supra,* at 273–74.

¶ 54. In *Vivid,* the court was unanimous in its agreement that the value of the location of the outdoor advertising signs was unique in character. I am convinced that the value of land holding mineral deposits is

likewise unique. I would hold as a matter of law that, before comparable sales can be used in a valuation of land with mineral deposits, there must be evidence of the quantity and quality of the mineral deposits in those other sales. I would go further. I am satisfied that only expert testimony will suffice to give the trial court this information.

¶ 55. Other jurisdictions have held likewise. A case cited by Rademann, *State of Louisiana Department of Transportation & Development v. Tynes*, 433 So. 2d 809 (La. Ct. App. 1983), is a case in point. There, the appellate court pointed out that there are the usual adjustments made when using comparable sales such as the circumstances of the sale, the proximity of the comparison sale to the subject sale, the size of the parcels and the physical characteristics of the land. *Id.* at 813. The trial court in the instant case considered those factors. But the Louisiana court said that there were additional variables that must be considered when evaluating land where extraction of minerals is the best use. The court wrote:

> When comparisons of tracts of sand land are made, additional variables are involved such as the size of the deposit, depth of overburden, types of sand and their respective proportion of volume, shape of angle of repose and market advantage.

*Id.*

¶ 56. Here, the trial court held the comparison data to no such standard. Neither does the majority. I would. I reject the idea that the price paid by area quarry operators to farmers in this case was the *fair* market value. Sure, it was the market value; there is no denying that. But the sales were quite possibly undervalued. I do not fault the quarry operators for not

having conducted soil borings before purchasing the properties. If they can get the property for less, it stands to reason that they do not need to spend the money to get a soil boring. But I venture to say that if one quarry operator were selling to another quarry operator, we would see two knowledgeable people bargaining about the worth of the property. Then I think we would see the true market value of the property.

¶ 57. I do not mean to suggest that the trial court should have adopted Rademann's income approach instead. Frankly, in my opinion, his offer of proof on that score shows only what the business was worth, not what another quarry operator would have paid for that portion of the property being condemned. I limit my dissent to arguing that evidence of comparable sales in land used for mineral extraction must include data regarding the quantity and quality of the minerals on those lands as a condition precedent to admission into evidence. It is not a question of weight of the evidence as the majority believes, but a question of admissibility. And although I have grave reservations about Rademann's income evidence, I realize that its admissibility is not my call to make in the first instance, especially since this is a dissent. Therefore, I would reverse and remand to the trial court with directions that it decide whether Rademann's income evidence is admissible, ordering further testimony if necessary.

## *LEATHEM SMITH* AND *VIVID*

¶ 58. Next, I consider the majority's treatment of *Vivid*. According to the majority, the *Vivid* court upheld the admissibility of both market and income evidence in a situation confined to its unique facts—the court was dealing with billboard signs. In my view, there was no

evidence of comparable sales of real estate in the *Vivid* case. Therefore, that case cannot stand for the proposition that one can have evidence of both comparable sales of real estate and an income approach in the same case.

¶ 59. I start with *Leathem Smith*. There, our supreme court expressed its strong view that the income approach was not favored in the law. It began its discussion by reviewing case law holding that evidence of net income is ordinarily inadmissible for purposes of establishing property values in condemnation cases involving commercial enterprises because business income is dependent upon too many variables to serve as a reliable guide for determining fair market value. *Leathem Smith*, 94 Wis. 2d at 413. The court noted three exceptions. Income evidence was admissible when (1) the character of the property is such that the profits are produced without the labor and skill of the owner, (2) profits reflect the property's chief source of value, and (3) the property is so unique that comparable sales are unavailable. *Id.* But the court said, in no uncertain terms, that "Wisconsin law holds that income evidence is *never admissible* where there is evidence of comparable sales." *Id.* (emphasis added). Because evidence of comparable sales had been admitted in that case, the supreme court affirmed the trial court's refusal to allow evidence using the income approach. *Id.* at 414.

¶ 60. *Vivid* was decided eighteen years later. Vivid is an outdoor sign company. It leases land from owners along highways and puts up billboards. In the case before the court, it had two such billboards along I-90. The State removed the billboards as part of a road improvement project and Vivid sought just compensation. The State argued that billboards did not come under the just compensation law. The supreme court

nixed that notion, holding that, in valuing outdoor advertising, the location has a value in and of itself. *Vivid*, 219 Wis. 2d at 781. Having determined that the State must compensate Vivid for the location loss, it then considered the valuation methods for determining such just compensation. *Id.* Vivid offered testimony regarding both the market and income approaches. *Id.* at 784. The State offered the cost approach. The market approach offered by Vivid used what was called a GIM. *Id.* Before the trial court, Rademann's attorney offered this explanation of *Vivid.*

> So we have a situation in *Vivid* where there was evidence of comparable sales admitted . . . and the income approach was also admitted. So I . . . respectfully submit that *Vivid* did amend . . . the inconsistent statements . . . in *Leathem Smith*. And now the rule is under *Vivid* that there can be admitted . . . both on the one hand comparable sales and on the other hand income approach evidence in the same case.

¶ 61. The majority apparently agrees with Rademann that the *Vivid* court gave its imprimatur to allowing evidence of both comparable sales and an income analysis, but it limits the imprimatur to billboard cases. I disagree. First of all, the lead opinion in *Vivid* was not the opinion of the court because only three justices signed onto it. Rather, the concurrence, with four justices signing, is the opinion of the court. *Id.* at 797 n.1. Second, while a three-member minority of the court accepted the GIM used by Vivid, the majority of the court declined to adopt that position. Therefore, even if it were correct that a GIM is simply one method of showing comparable sales of real property, the GIM was not accepted by a majority of the court. Therefore, I think the majority and Rademann are wrong to say

that the supreme court adopted the view that income evidence may be admitted in addition to the admission of comparable sales data.

¶ 62. Third, I do not accept the argument that the GIM used in *Vivid* can be described as a method of showing comparable sales of real property. The concurrence in *Vivid* explained that the GIM is a comparison of the value of similar businesses using multipliers. The concurrence further observed that the GIM is determined by dividing the sales price of a group of signs by the annual gross rental income generated by the signs. The concurring opinion had the following problem with the GIM: "[I]n many cases, the application of the GIM will result in compensation for loss of business profits and for the value of expectation of lease renewal. Compensation for such items is specifically prohibited by our prior cases." *Id*. at 797. It is an earnings-dependent valuation technique. *Id*. at 798.

¶ 63. I am convinced that although the GIM can be described as a "market approach," it is not the same as a comparison of allegedly similar sales of real estate. This is because the value is at least partially based on earnings of the business. Pure real estate comparisons do not compare earnings value. I conclude that even had a majority of the *Vivid* court upheld the admission of the GIM into evidence, there would still have been a lack of any evidence of comparable sales of real estate. Therefore, *Vivid* cannot stand as proof that Wisconsin allows evidence of comparable sales of real estate and evidence using the income approach to be admitted in the same case. To the extent that the majority believes otherwise, I disagree. I do agree that *Vivid* may not be used as the vehicle by which Rademann can drive his

income approach into the case if the comparable sales data is already parked there. But I agree for different reasons.

¶ 64. Therefore, I respectfully dissent in part and concur in part.